97 N.J. Super. 435 (1967)
235 A.2d 235
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HERBERT LEE CAMPBELL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1967.
Decided November 8, 1967.
*438 Before Judges KILKENNY, CARTON and FRITZ.
Mr. Harvey Weissbard argued the cause for appellant (Messrs. Querques & Isles, attorneys).
*439 Mr. Lawrence S. Schwartz, Assistant County Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney; Mr. Barry H. Evenchick, Assistant County Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by CARTON, J.A.D.
The County Court, sitting without a jury, convicted defendant of possession of lottery slips in violation of N.J.S. 2A:121-3. Defendant seeks a reversal on the single ground that the search of his person was unreasonable and the evidence obtained thereby (lottery slips) should have been suppressed.
On the motion before trial an officer of the Newark police force testified that on October 21, 1966, while on motorcycle duty, he observed defendant driving a 1954 Chevrolet on Bergen Street. Defendant's car stopped for a traffic light and turned into Springfield Avenue. The officer observed that the automobile had only one headlight due to the absence of a left fender.
The officer requested defendant to pull the car over to the curb and then asked him for his license and registration. Defendant supplied his own name and address, but could produce neither a driver's license nor the car registration. Defendant told the officer he had borrowed the car from a man in a garage on Avon Avenue, about five blocks away. Defendant gave the officer the first name of the man whose car he said he borrowed, but did not know his last name. Asked what police action he took at that time, the officer replied:
"Under the circumstances, I had no valid identification to prove who he was. He didn't know the owner of the car. I informed him that he was going to be locked up for unlicensed driver and with no registration, so on, and I called for a radio car."
The officer described what happened next in the following language:
*440 "When the radio car arrived, just before placing him in the rear seat for transportation to the precinct, I gave him what we consider a pat-down, at which time I felt a bulge in his coat. I put my hand in the pocket where the bulge was, and at this time I pulled out this envelope. Looking in the envelope there was several envelopes, I believe. There was the ten and also papers that appeared to be lottery slips."
The officer said that he then took possession of the lottery slips.
On cross-examination the officer testified that the reason he stopped the car was because of the fact that it had no headlight and that it was being operated in violation of R.S. 39:3-56. The automobile had a license plate on it. His purpose, the officer stated, in "patting the defendant down" was "to check for weapons" and to make sure the defendant was not "carrying anything dangerous." He declared that when he felt the bulge and pulled out the envelope, it was a "large envelope"; that he looked inside and saw "smaller envelopes and lottery slips." "Some of the slips were in the large envelope and some in the smaller envelopes."
Later he issued three traffic tickets to defendant for violations of R.S. 39:3-56 (lack of lighted headlight), 39:3-29 (lack of possession of operator's license and vehicle registration), and 39:3-10 (lack of driver's license). The officer testified that he had been on motorcycle duty approximately four years. During that time he had many occasions to stop other people who could not produce their registration. This type of occurrence, he said, was not considered particularly unusual.
At the trial the objection to the introduction of the evidence was renewed. The arresting officer iterated generally the testimony he gave at the hearing on the motion and gave some additional details. He said he found a manila envelope and other papers in defendant's coat pocket. He identified ten small manila envelopes found inside the larger envelope and described their dimensions as about 3" x 5" *441 or 7". He conceded they were not very bulky individually. He gave no details as to the size of the larger envelope, its thickness, weight or texture, nor could he recall whether the other two items (apparently lottery slips) were found in an envelope or loose.
The small manila envelopes were marked as exhibits, but the envelope from which they were removed was not. Another officer who examined the envelopes identified their contents as lottery slips. He conceded that the total bulk of the entire pack of envelopes was very, very thin  "about a quarter of an inch  give or take." Our inspection of the exhibits confirms this description. Each of the envelopes measures 4" x 6 1/2", is very thin, contains only one or two single slips of paper, and resembles those frequently used by banks and business concerns to hold individual salary payments to employees.
The trial court, in denying the motion, found that the arrest of defendant was valid and the search of his person, which resulted in the discovery of lottery slips, was also valid as incidental to that arrest.
The validity of the arrest for the traffic violation cannot be disputed. A police officer is authorized by statute to arrest without a warrant any person violating, in his presence, a provision of the Traffic Act N.J.S. 39:5-25. Nor can it be disputed that a search may be made as an incident to an arrest if reasonably necessary to protect the arresting officer from attack, to prevent escape or to prevent destruction of evidence. See State v. Boykins, 50 N.J. 73, 76 (1967); Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777, 780 (1964).
But evidence of transgression of a traffic law does not authorize a general search either of the person or of the vehicle involved. The guidelines for the scope of the preliminary search permissible under such circumstances are laid down in Boykins, supra:
*442 "A traffic violation as such will justify a search for things related to it. * * * If an officer decides to take a traffic violator into custody rather than to issue a summons, he may search the occupants of the car for weapons if he reasonably believes it necessary for his own protection or to prevent an escape." (at p. 77)
In this case the officer announced his intention of taking defendant into custody. His purpose in "patting down" defendant was to "check for weapons." Consequently, the "pat-down," which the officer also described as a "frisk" (a term by which this practice is more commonly known), was permissible as incident to the traffic arrest if the officer reasonably believed it necessary for his protection.
The present inquiry is not as to the legality of such a police tactic under any circumstances, or as to the reasonableness of its use in conjunction with the investigation of a traffic arrest. It concerns the extent or scope of the officer's right to make such a precautionary search for weapons, assuming that the circumstances justify such search at all. Even more specifically, the question posed is whether he may investigate further once he has ascertained the defendant possessed no weapon.
This narrow issue is pinpointed in State v. Terry, 5 Ohio App.2d 122, 214 N.E.2d 114, 120 (App. Ct. 1966), certiorari granted 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 989 (1967), a case involving the validity of stopping and frisking of a pedestrian:
"However, we must be careful to distinguish that the `frisk' authorized herein includes only a `frisk' for a dangerous weapon. It by no means authorizes a search for contraband, evidentiary material, or anything else in the absence of reasonable grounds to arrest."
The frisk, "as it is generally understood in police usage, is a contact or patting of the outer clothing of a person to detect, by the sense of touch, if a concealed weapon is being carried." People v. Rivera, 14 N.Y.2d 441, 252 *443 N.Y.S.2d 458, 201 N.E.2d 32, 35 (Ct. App. 1964). This definition seems aptly to describe the "pat-down" in this case, and for purposes of this opinion we shall use the terms interchangeably.
In making the frisk the officer does so because he desires to protect himself, not because he is seeking evidence. See State v. Dilley, 49 N.J. 460 (1967). In order to insure that self-protection, it would seem that the officer is justified in taking any incidental action reasonably necessary to determine whether the defendant possesses a dangerous weapon which may imperil the officer's safety. If the touching of the outer clothing reveals or suggests the presence of a weapon, the officer would need to investigate further to ascertain the nature of the suspicious object and to remove it from the suspect's apparel for inspection. See People v. Rivera, supra, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d, at pp. 35-36.
However, he may not, under the guise of frisking for weapons, conduct a further exploratory investigation unrelated to the limited purpose of insuring his self-protection. The frisk finds its justification in intruding on the individual's person and invading his personal liberty because of the overriding interest of society in effective law enforcement. State v. Dilley, supra. Even this limited touching of the person is viewed by some authorities to be so grave an affront to individuality and to present such great possibility of abuse that it should be wholly condemned. See Fuld, J., dissenting in People v. Rivera, supra, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d, at pp. 37-38.
The case before us illustrates the dangers inherent in permitting any frisk and the vigilance necessary to restrict the tactic to constitutionally permissible limits.
The proposed tentative draft of the American Law Institute's Model Code of Criminal Procedure, § 2.02, recognizes the need for adequate safeguards in any "stop and frisk" law. It provides:
*444 "* * *
(5) Search for Dangerous Weapons. A law enforcement officer who has stopped or ordered any person to remain in his presence pursuant to this section may, if he reasonably believes that his safety so requires, search such person and his immediate surroundings, but only to the extent necessary to discover any dangerous weapons which may on that occasion be used against the officer. * * *"
And see comments thereon  Younger, "Stop and Frisk: `Say it like it is,'" 58 J. Crim. L.C. & P.S. 293 (1967).
The arresting officer testified that in patting down defendant he detected a "bulge" in his pocket. It developed that the bulge was caused by the presence of a manila envelope, the total bulk of whose contents created a packet having a thickness of only a quarter of an inch. The record is silent as to any basis for suspicion that the envelope could have contained or concealed a weapon, and no weapon was discovered. The slight size, bulk, weight and feel of the contents of the large envelope satisfies us that there could have been no reasonable basis for a suspicion that a dangerous weapon was secreted.
Nevertheless, the officer removed the envelope from the defendant's pocket and inspected and confiscated its contents. As we view the evidence, under no conceivable circumstances could this action have been for the purpose of insuring his protection. The removal of the envelope from defendant's pocket and the inspection of the contents were clearly for the purpose of looking for evidence. Consequently, once he had ascertained that defendant possessed no weapon, there existed no further right of investigation.
The fact that policy slips, rather than a prayer book, a packet of credit cards, a bank statement, or some equally innocuous object, were found in the envelope does not justify this further intrusion on the personal integrity of the defendant. The result of the search may not determine its validity. If the Fourth Amendment and the right of privacy are to be meaningful, a defendant's right to inviolability of his person from unreasonable search and seizure *445 must be as great as that of the most decorous citizen. The purpose of the exclusionary rule is to control police conduct, and it is in this context it must be applied here. See State v. Dilley, supra, 49 N.J., at p. 469.
Nor can the further search of defendant's person and the opening of the envelope found in his pocket be justified, as the State very tentatively suggested at the oral argument, on the theory that the officer might have had reason to believe defendant was involved in some criminal activity apart from the traffic violations. The record is barren of any evidence that the defendant's behavior was furtive or unusual in any way, and the officer himself conceded that this type of occurrence was not unusual. The further suggestion that there might have been some reason to suspect defendant had stolen the car seems far-fetched. The vehicle involved was of ancient vintage, of obviously nominal value, operating with only one headlight and conspicuously lacking a front fender  an unlikely object of an automobile theft under the circumstances. Cf. State v. Scanlon, 84 N.J. Super. 427, 436 (App. Div. 1964).
We conclude that the motion to suppress should have been granted and that the evidence resulting from the search should have been excluded. Accordingly, the judgment of conviction is reversed and the case remanded.