125 N.J. Super. 278 (1973)
310 A.2d 506
IN RE STATE OF NEW JERSEY IN THE INTEREST OF D.S., JUVENILE-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1973.
Decided April 2, 1973.
*280 Before Judges CARTON, MINTZ and BOTTER.
Mr. David R. Arrajj, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney; Mr. William E. Norris, Assistant Deputy Public Defender, of counsel).
Mr. Kenneth Ply, Assistant Prosecutor, argued the cause for State of New Jersey, (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
PER CURIAM.
Defendant, a juvenile 16 years of age, was adjudicated a delinquent by reason of his possession of three glassine envelopes containing heroin in violation of N.J.S.A. 24:18-4.
On appeal he contends that the trial court erred in denying his motion to suppress. The only witness for the State on that motion was Patrolman Moretti of the Newark Police Department. He testified that on October 4, 1970, about 10 P.M., he and his partner Patrolman Romanella were on routine patrol duty in an unmarked radio car, but in uniform, in the vicinity of South Orange Avenue and 19th Street, proceeding northerly on 19th Street. As they entered the intersection he observed two colored males standing on the north-west corner of the intersection. They were juveniles, and "all of a sudden" one colored male, having a youthful appearance, exited from the bar situate on the corner. He approached the other two males standing on the corner. The officer further testified that he and his fellow officer assumed that there might have been some connection with the tavern since it was in an area "high on narcotics" they proceeded towards them to see "if anything was being transacted." The tavern in question was one of three bars in the area *281 known to sell narcotics. The three males were talking for a few seconds "and as we approached them they split up." The police vehicle came to a stop. The officers called all three over to them and asked "what they were doing in the area, and what the man was doing inside that particular bar," and "they said nothing." Moretti then testified that they asked for some identification since they intended to run a record check on them. The three males were then asked to step to the back of radio car where the officers proceeded "to pat them down," so as to protect themselves from physical harm from weapons they might have. As a result of this pat down Moretti felt a "bulge" in one of the juvenile's rear pocket. He was asked to remove it so that it might be inspected to determine if it contained a weapon. Defendant complied and pulled out a small brown piece of paper, inside of which the officer found wrapped three glassine envelopes and a package of cigarette paper, all of which was secured by a rubber band. After the package was found defendant was placed under arrest. The other two males were released. Upon analysis the substance in the glassine envelopes was found to be heroin.
The investigatory stop of defendant was clearly justifiable. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. York, 116 N.J. Super. 440 (App. Div. 1971). We recognize that the factual circumstances here presented may not be as compelling as those presented in the cited cases. However, none of those cases concerned the investigatory detention of a juvenile in the company of one and possibly two other juveniles at the relatively late hour of 10 P.M. in a high crime narcotics area standing near a tavern known to dispense narcotics and the trio "splitting up" as the officers approached them. These singular facts sufficiently justified the investigatory detention of defendant. When a police officer stops a person on the street for summary inquiry, the incidental *282 temporary detention is not to be viewed as a formal arrest requiring probable cause, State v. Dilley, 49 N.J. 460, 467 (1967).
Moreover, such facts coupled with the refusal of the youngsters to respond to the police officer's inquiry, justified the pat down search of defendant for a concealed weapon. State v. Dilley, supra. As was so aptly observed in State v. Dennis, 113 N.J. Super. 292, 297 (App. Div. 1971), certif. den. 58 N.J. 337 (1971), "The Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed." We believe that under all the stated circumstances, the police officers had a reasonable basis to believe that defendant and his companions may have been armed. Weapons in high crime areas are readily available, and considering the pertinent facts the police officer had the right to make a self-protective frisk. In this respect, the instant case is distinguishable from Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), where the frisk was conducted not for a weapon but obviously in search of narcotics.
Defendant argues that the small size of the package seized from defendant renders the search violative of the Fourth Amendment by virtue of its unreasonable scope. The entire package containing the three decks of heroin and the cigarette paper was about two inches long, one and one-half inches wide, and one-third of an inch thick. However, as observed in State v. Campbell, 53 N.J. 230, 238 (1969), the seized object might well have contained a weapon such as a thin knife or blade.
Finally, we are mindful that the use or sale of illegal drugs has reached alarming proportions, and is carried on furtively and in as many conceivable ways as human ingenuity can devise in order to escape detection and criminal consequences. In this frame work the total circumstances are to be assessed, and the entire transaction viewed in a common sense, realistic fashion. State v. Williams, 117 N.J. Super. 372 (App. Div. *283 1971), affirmed o.b. 59 N.J. 535 (1971). Considering the totality of the circumstances, the motion to suppress was properly denied.
Affirmed.
BOTTER, J.S.C. (dissenting).
Defendant, age 16, and another black youngster were standing on a street corner outside a tavern in a well lighted area. A third individual of "youthful appearance" came out of the tavern and joined them. Two officers in an unmarked police car decided to "check [them] out and to see if anything had happened or if anything was being transacted." The officers had heard nothing and had seen nothing pass among the three. As one officer testified, they were "just standing there talking for a few seconds and as we approached them they split up." There was no testimony that the individuals began to run or were even aware of the officers' presence. They came over to the police car at the officers' request.
The police officers asked what they were doing in the area, "and they said nothing." Identification was requested, but the officer who testified could not recall if all three had produced identification. When patted down, a packet containing cigarette paper and three thin glassine envelopes of heroin was found in defendant's rear pocket. Defendant was arrested and the others were released.
In my opinion the conduct of defendant and his companions gave no suggestion whatever that they were engaging in crime or were about to do so. The facts here do not warrant an "investigatory stop" and frisk. Furthermore, there was absolutely no indication that the three were "armed and dangerous." All you have are two black teenagers talking on a street corner at 10 P.M. in early October, joined by a third male who has exited from a tavern. Notwithstanding that the three taverns located in the area were known for narcotics traffic, there is less reason here to suspect defendant of criminal conduct than in Sibron v. New York, 392 U.S. 40, 88 *284 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and yet in Sibron the United States Supreme Court suppressed evidence as unconstitutionally seized.
In Sibron, over an eight-hour period, defendant had conversed with nine or more persons who were known narcartics addicts. Nothing was overheard and nothing was seen to pass between Sibron and the others. The court held that:
The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security. 392 U.S. at 62, 88 S.Ct. at 1902.
The court further said:
The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. Terry v. Ohio, supra. Patrolman Martin's testimony reveals no such facts. The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime. 392 U.S. at 64, 88 S.Ct. at 1903.
As pointed out by Mr. Justice Harlan, concurring in Sibron, 392 U.S. at 72, 88 S.Ct. at 1907, a stop, short of an arrest, was authorized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):
`[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ...'
Read in the light of the above standards, neither the stop nor the search were authorized in the case at hand. None of the cases cited by the majority of this court go so far as to *285 authorize a stop and search on as little evidence as exists here. For example, in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the investigatory stop was based upon information from a reliable informant, partly verified, that an individual seated in a nearby vehicle was carrying narcotics and possessed a gun. In Terry v. Ohio, supra, an officer observed two men who appeared to be "casing" a store for a possible robbery. In State v. York, 116 N.J. Super. 440 (App. Div. 1971), the defendant had been under surveillance because of his association with known narcotics violators; and, when approached by the police, he turned and handed a handkerchief containing heroin to someone behind him. The investigatory stop in State v. Dilley, 49 N.J. 460 (1967), followed the officer's observation of two individuals at 3:00 A.M. who were lingering between automobiles in a parking lot, and who had been observed earlier walking down the street turning their heads every few steps, looking to the rear. Finally, State v. Williams, 117 N.J. Super. 372 (App. Div. 1971), affirmed o.b., 59 N.J. 535 (1971), involved a defendant who had been observed conversing with known narcotics violators, and who, when the police approached, made a furtive downward motion, throwing a pink package to the floor of the car.
The facts at hand present none of the circumstances which supported the "stops" in the above cases. Defendant and his companions were not known to the arresting officers as narcotics violators, nor were their actions furtive. Mere presence in the vicinity of a tavern where others have been known to deal in narcotics is not enough to create reasonable suspicions about this defendant and his companions.
The majority opinion gives weight to the "refusal of the youngsters to respond" to the police officer's inquiry. No officer testified that defendant and his companions "refused to respond" to their inquiries, and the trial judge made no such finding. The three came over when called and apparently cooperated when asked for identification. One officer *286 testified that when he asked what they were doing there, "they said nothing." The meaning of this testimony is not entirely clear. It may well be that the youths answered, "nothing," a perfectly normal response for youngsters in that situation. In any case, the silence of one who is asked to explain his conduct cannot be considered affirmative evidence of an attempt to do an unlawful act (State v. Zito, 54 N.J. 206, 215 (1969)), although it may reinforce suspicion aroused by his prior conduct.
Mere presence in a high crime or narcotics area does not give the police reasonable grounds for an investigatory stop and frisk where the conduct of the suspect itself adds nothing to justify police intrusion. See Cunha v. Superior Court of Alameda County, 2 Cal.3d 352, 85 Cal. Rptr. 160, 466 P.2d 704 (1970); People v. Moore, 69 Cal.2d 674, 72 Cal. Rptr. 800, 446 P.2d 800 (1969). Those who deal in narcotics may act furtively, and with ingenuity, but there is no evidence that defendant on the night in question engaged in any conduct that could be so described.
Moreover, the police were not justified in unwrapping the 2 inch by 1-1/2 inch by 1/3 inch brown paper package, secured by a rubber band, which was found in defendant's pocket. To say that it may have contained a thin knife or razor blade in an obvious evasion of the rule of law enunciated by the United States Supreme Court in Terry v. Ohio, supra, which allows police to make a protective search in limited instances. In Terry, the court allowed a search for weapons when the officer is justified in believing that the suspect is "armed and presently dangerous," specifying that such a search cannot be a "full" search but must be "strictly circumscribed by the exigencies which justify its initiation." 392 U.S. at 24, 26, 88 S.Ct. at 1882. It can hardly be imagined that the police were looking for a weapon, rather than narcotics, when the paper package was unwrapped. The police had no grounds for an arrest, as in State v. Campbell, 53 N.J. 230 (1969), reversing 97 N.J. Super. 435 (App. Div. *287 1967), and no reason to fear defendant who was so "armed." Presumably, the police had guns. Surely they were well enough protected against a person who would have no reason, if released, to reach into his hip pocket and start unwrapping a paper package in order to take out such an imagined weapon.
Accordingly, I would suppress the evidence and set aside the judgment of conviction.