## KENTUCKY TOBACCO PRODUCTS CO. v. LUCAS, Collector of Internal Revenue.

(District Court, W. D. Kentucky. April 17, 1925.)

No. 757.

1. **Corporations** ⊚⊃448(3)—**Corporation may enforce a contract made for its benefit before its organization.**

A corporation, for whose benefit a contract was made before its organization, and as consideration for which a part of its stock was issued to the second party, may enforce any rights secured to it by such contract.

2. **Contracts** ⊚⊃10(4)—**A contract, binding one party to "purchase" certain property from the other, held to bind the other party to sell.**

A contract, providing that one party "shall purchase" from the other its output of tobacco stems for ten years, held by implication to bind the other party to sell.

3. **Sales** ⊚⊃1(4)—**Contract for entire output of a producer held not void for indefiniteness.**

A contract by a corporation for the sale of its "entire output" of a certain product for a term of years is not void for indefiniteness.

**4. Internal revenue ⬤⟞7—Computation of value of contract.**

In determining, for income and excess profits tax purposes, whether a contract, in existence on March 1, 1913, under which corporation was entitled to purchase the material for its manufacture from another corporation for a term of years at a stated price, was enforceable, the possibility that the selling corporation might go out of business and terminate the contract before the end of the term *held* not a factor to be considered.

**5. Internal revenue ⬤⟞7—Congress may tax income without deduction because of exhaustion of capital.**

Under the Sixteenth Constitutional Amendment, Congress, in taxing income, need not allow deduction because invested capital is gradually being exhausted.

**6. Internal revenue ⬤⟞7—Provision of statute for income tax deductions by corporation held not to include diminished value of contract arising from lapse of time.**

Under Revenue Act 1916, § 12 (Comp. St. § 6336*l*), providing for a deduction from the gross income of a corporation of a reasonable allowance for the exhaustion, wear and tear of property "arising out of its use or employment in the business or trade," does not authorize deduction for the diminished value of a contract essential to the business, arising solely from lapse of time, which shortens the life of the contract, which diminished value is not caused by its use, but would be the same whether the business was or was not carried on.

**7. Internal revenue ⬤⟞7—Provision of statute for income tax deductions by corporation held to include diminished value of contract arising from lapse of time.**

Such deduction is allowable, however, under Revenue Act 1918, § 234 (a) (7), being Comp. St. Ann. Supp. 1919, § 6336⅛pp, providing for deduction of "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business; including a reasonable allowance for obsolescence."

**8. Internal revenue ⬤⟞7—Corporation held entitled to deduction for exhaustion of contract.**

A corporation which on March 1, 1913, held a contract under which it was entitled to purchase the material for its manufacturing business for a term of years at a stated price, which had on that date 76 months to run, *held*, under Revenue Act 1918, § 234(a) (7), being Comp. St. Ann. Supp. 1919, § 6336⅛pp, entitled to a deduction from its gross income for each year during the life of the contract of $12/76$ of its fair value on March 1, 1913, consisting of present value on that date of difference between market value and contract price of material which it was reasonably certain to purchase.

At Law. Action by the Kentucky Tobacco Products Company against Robert H. Lucas, Collector of Internal Revenue. Judgment for plaintiff for part of claim.

Humphrey, Crawford & Middleton, of Louisville, Ky., for plaintiff.

W. S. Ball, U. S. Dist. Atty., of Louisville, Ky., and Floyd Toomey, of Washington, D. C., for defendant.

DAWSON, District Judge. In this action the plaintiff, Kentucky Tobacco Products Company, a New Jersey corporation, which during its active business existence was engaged in business in Kentucky, seeks to recover from the defendant, Robert H. Lucas, collector of internal revenue of the United States for the district of Kentucky, the sum of $209,378.84, paid by it under protest on March 13, 1923, to the defendant as income and profit taxes for the years 1917, 1918, and 1919, in excess of the amount plaintiff claimed it owed for those years, with interest on said sum from March 13, 1913, and the sum of $24,253.05 interest on the first-named sum, paid by the plaintiff under protest on March 23, 1923, and interest on this sum from March 23, 1923. By written stipulation the case is submitted to the court for trial without the intervention of a jury, and plaintiff has asked for a separate finding of facts and conclusions of law.

As disclosed by the record, the uncontradicted facts are, that prior to July 17, 1899, the Louisville Spirit Cured Tobacco Company, a Kentucky corporation, was engaged in the leaf tobacco business, in the manipulation of Virginia wrappers under patents, and in the manufacture of certain extracts and products of tobacco stems, and this company used in its business tobacco stems from which the leaf proper had been taken. The stems used and required in use were in large part Burley stems.

At the inception of this company's business, and up to as late as 1895, it had been able to create but little demand for the product of the stems, nor was there any other company in the United States at that time with any considerable market for the product of Burley stems. As a result of this situation, up to 1895 the stems could be procured from the various companies producing them at a very nominal figure. At that time the Continental Tobacco Company and its constituent companies produced about 85 per cent. of the Burley stems of the United States, and this ratio has been approximately maintained at all times since that date by that company, or its successor, the American Tobacco Company, and its constituent companies, which were later, by virtue of the decision of the Supreme Court in the case of United States v. American Tobacco Co.

et al., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663, dissolved into separate units.

As the processes of the Louisville Spirit Cured Tobacco Company for the manufacture of extracts were perfected, and as its market expanded, and with the entry of other companies into the same field of endeavor, the demand for Burley stems became more active, with a resulting increase in price. Due to the fact, however, that the Continental Company required competitive bidding for its output of stems, no one company could be assured from year to year that it would obtain the stems necessary for its business. Therefore it became evident, for the business to be successful and to grow, that it would be necessary to have a continuing and assured supply of stems at a stable price, of sufficient volume to justify development and exploitation.

To meet this situation, on the 17th day of July, 1899, a written contract was entered into between the Louisville Spirit Cured Tobacco Company, as party of the first part, G. H. Lindenberger and Walker Bowman, the principal stockholders of the Louisville Spirit Cured Tobacco Company, parties of the second part, and the Continental Tobacco Company, party of the third part, by the terms of which it was agreed that a New Jersey corporation, to be known as "Tobacco Dip & Powder Company," should be organized, with an authorized capital stock of $1,000,000, and that the Louisville Spirit Cured Tobacco Company, in consideration of $450,000 of the capital stock of the new corporation, to be distributed to the stockholders of the Louisville Spirit Cured Tobacco Company in proportion to their respective stockholdings in said company, would convey to the new corporation all the patents, good will, business, trade-marks, property, assets, effects, and estate of the said Louisville Spirit Cured Tobacco Company, and that of this $450,000 worth of capital stock of the new corporation a sum equal to the inventory of the tangible assets of the Louisville Spirit Cured Tobacco Company should be in preferred stock and the balance in common stock. As to the remaining $550,000 of stock in the new company, the following provision was made:

"The balance of the stock of said new company, to wit, five hundred and fifty thousand dollars ($550,000), shall be issued to the Continental Company, in consideration of the Continental Company agreeing to enter into and entering into contracts with the new company as hereinafter set out and provided for."

In so far as material to this case, the provision referred to above, concerning contracts which the Continental Company should enter into with the new company, was in the following language:

"The new company shall purchase from the Continental Company its entire output of Burley tobacco stems for a period of ten years from July 1, 1899, at the following prices: The first year of said ten-year term five dollars and seventy-five cents ($5.75) per ton of said stems; and thereafter at eight dollars and fifty-one cents ($8.51) per ton of said stems; to be furnished in the same condition commercially as the stems now being made by the Continental Company and uncleaned by any stem-cleaning machine, or otherwise, except by the hand of the stemmer in the first separation of the stem from the leaf; payments to be made monthly, according to the statements rendered by the Continental Company to said new company; said payments to be made on or before the 10th day of each month for the stems furnished during the preceding month; in case the new company fails to make payment by the 10th of said month, the contract, at the option of the Continental Company, shall be forfeited. This contract shall, at the option of said new company, at the expiration of said first ten-year term, if it has not in the meanwhile been forfeited as above provided, be renewed for another term of ten years, but a forfeiture of said contract by the default of said new company, as hereinbefore provided for, shall not be taken as an abrogation of this contract, and shall not affect the right and title of the Continental Company's said five hundred and fifty thousand dollars ($550,000) stock in the new company hereinbefore provided for."

The contract contained this further provision:

"It is especially agreed that the only issue of preferred stock shall be for the tangible available assets of the Louisville Company (Louisville Spirit Cured Tobacco Company), as hereinbefore provided for, and that the new company shall be and it is hereby prohibited from issuing any other or further preferred stock."

Promptly following the execution of this contract, the New Jersey Company, with an authorized capital stock of $1,000,000, was organized, and apparently without objection upon the part of any of the parties to the contract of July 17, 1899, it was named the "Kentucky Tobacco Products Company," instead of "Tobacco Dip & Powder Company." This new company issued to the stockholders

of the Louisville Spirit Cured Tobacco Company, in proportion to their holdings in the last-named company, $190,000 of its preferred stock, representing the value of the tangible assets conveyed to it by the Louisville Spirit Cured Tobacco Company, and $260,000 of its common stock, and proper conveyances were executed, conveying to the new company all the patents, good will, business, trade-marks, property, and assets of the Louisville Spirit Cured Tobacco Company. The new company issued to the Continental Tobacco Company the remaining $550,000 of the authorized capital stock.

Thereupon, according to the terms of the contract of July 17, 1899, the new corporation commenced to purchase, and the Continental Tobacco Company commenced to sell to the new company, its entire output of Burley stems, and this was continued by the American Tobacco Company and later by its constituent units, following the dissolution of the so-called tobacco trust. No written contract was executed between the Continental Tobacco Company, or its successors, and the Kentucky Tobacco Products Company during the first ten-year period of the contract, as provided in the contract of July 17, 1899, the parties apparently proceeding upon the idea that the contract of July 17, 1899, was a sufficient memorial evidencing their relation. However, on March 19, 1909, which was shortly before the expiration of the first ten-year period of the contract, the Kentucky Tobacco Products Company, by letter of that date addressed to the American Tobacco Company, notified that company of its election to continue in effect the provisions of the contract of July 17, 1899, for another ten years, and the American Tobacco Company, under date of April 5, 1909, acknowledged the letter of the Kentucky Tobacco Products Company in the following language:

"We acknowledge receipt of your letter dated March 19, 1909, signed by Mr. Lindenberger, your president, and delivered personally to the subscriber hereto, and the letter has been filed with the contract to which it refers."

The Kentucky Tobacco Products Company, as well as its successor, the American Tobacco Company, and, after its dissolution, its constituent units, during the entire period of twenty years, ending in 1919, fully observed the provisions relative to the buying and selling of the Burley stems referred to in the contract of July 17, 1899; all the parties apparently recognizing as binding upon them the provisions contained in that contract. After the Kentucky Tobacco Products Company commenced to operate under the provisions of the contract of July 17, 1899, its business developed very rapidly, and the proof shows that during its existence it had practically a monopoly of the business of treating Burley stems, and by March 1, 1913, it was apparent that its control of available Burley stems gave it such an advantage in the field occupied by it as to free it from competition. No inconsiderable part of its profit was due to the fact that it was discovered that enough Burley scrap could be recovered from the stems in the condition they were required to be left under the contract of July 17, 1899, to more than pay for the entire cost under the contract of the stems themselves. The plaintiff has proven, and this is not controverted, that the control of 85 per cent. of the Burley stems of the United States assured by this contract made it possible for plaintiff to operate at a profit, and that without the benefits of such contract, it could not profitably continue its business, and that therefore, when the contract terminated in 1919, it ceased business and went into voluntary liquidation, after unsuccessfully attempting to get a renewal of the contract.

Under this state of facts, the plaintiff contends that as of March 1, 1913, the contract referred to was of the fair value of $1,225,000, and inasmuch as on that date it had only 76 months to run, it was entitled, in computing its income tax for the years 1917, 1918, and 1919, to have deducted from the gross income for each of those years $\frac{12}{76}$ of the value of said contract as of March 1, 1913. The government, in computing plaintiff's tax for the years in question, refused to allow any such deduction. It is agreed that this ruling of the government resulted in plaintiff being required to pay the amounts in taxes and interest which are sought to be recovered in this case.

Plaintiff's contention may be stated under the following heads:

(1) That the contract referred to was a part of its invested capital, and inasmuch as on March 1, 1913, the effective date of the Sixteenth Amendment, it had only 76 months to run, in computing any income taxes against it, it was entitled to have that contract so amortized over the 76 months, and such a proportionate part of its value deducted from its gross income each year, as to result in restoring untaxed to the plaintiff at the expiration of the contract its entire value as of March 1, 1913, and that the proper deduction for each year was $\frac{12}{76}$ of

the entire value of the contract. Plaintiff contends that to compute its income and profit tax for the years 1917, 1918, and 1919 without such deduction would result in taxation of its capital, and to that extent would be a direct tax without apportionment, in violation of the federal Constitution.

(2) That the contract in question was "property," within the meaning of the Revenue Act of 1916 (Act Sept. 8, 1916, § 12[a], being Comp. St. § 6336*l*), which authorized a deduction from gross income of "a reasonable allowance for exhaustion, wear and tear of property arising out of its use or employment in the business or trade," and within the meaning of the Act of 1918, c. 18 (40 Stat. 1057), which authorized to be deducted from gross income "a reasonable allowance for exhaustion, wear and tear of the property used in the trade or business, including a reasonable allowance for obsolescence"; these two acts being the ones applicable to the years involved in this case.

In opposition to the contention of the plaintiff, it is contended by the government:

1. That the plaintiff had no valid contract on March 1, 1913, because: (a) The plaintiff and the Continental Tobacco Company never entered into the written contract provided for by the agreement of July 17, 1899. (b) The written agreement of July 17, 1899, so far as it affected the plaintiff and the Continental Tobacco Company, was a unilateral one, and therefore unenforceable.

2. That there is no constitutional objection to taxing as income the receipts from the use of capital without restoring the loss of capital value in the form of a depreciation or amortization allowance, and that if such deduction from gross income is allowed, it must be found in the provisions of the acts of 1916 and 1918, which determine the amount of taxes to be paid by the plaintiff for the years in question in this case.

3. That neither the act of 1916 nor the act of 1918 authorizes a deduction from gross income of any amount for depreciation or exhaustion of the value of a contract such as the one involved in this case.

4. That even if the acts of 1916 and 1918 should be construed to authorize such deduction, plaintiff has failed to establish by any satisfactory proof the value of the contract as of March 1, 1913.

This contract was under fire in the case of United States v. American Tobacco Co. et al., supra, as tending to create a monopoly, but as neither the lower court, nor the Supreme Court in that case, declared it to be illegal on that ground, its legality here will be tested solely on the grounds here urged.

[1, 2] The court has had no difficulty in reaching the conclusion that the first objection urged by the government is without merit. The contract of July 17, 1899, in contemplation of the parties thereto, was as much for the benefit of the new company which that contract provided should be organized, as for the benefit of those signing that instrument, and under the generally recognized rule in this country, where a contract between parties is for the benefit of a third party, such third party, by appropriate action, may enforce any rights secured to it by such contract, even though such third party was not in being at the time of the execution of such contract. Nor is the contract a unilateral one. It is true that the contract provides, "The new company shall purchase from the Continental Company its entire output of Burley tobacco stems for a period of ten years from July 1, 1899," etc., and that there is no express provision that the Continental Company shall sell such entire output to the new company, but the contention of the government, that the failure of the contract in express words to impose this obligation upon the Continental Company makes the contract a unilateral one, is the utmost refinement of construction. In construing all contracts it is the duty of the court to arrive at the intention of the parties, if such intention can be gathered from the language of the contract itself, and the court has no hesitation in holding that the Continental Company, by the contract in question, intended to and did obligate itself to furnish its entire output of Burley stems, during the period covered by the contract, to the new company, as fully as if it had so undertaken in express language.

[3] Neither is the contract so indefinite as to the amount of stems to be furnished as to make it unenforceable. That a contract for the sale or purchase of a commodity, the quantity to be delivered or received to be measured by the output or requirements of an established plant or business, is not void for indefiniteness or for lack of mutuality, is too well settled to be open to serious question.

[4] Nor is the court impressed with the suggestion of the government that the Continental Company might have gone out of business, and thereby terminated the contract before it expired by its terms. The Continental Tobacco Company received $550,000 of the stock of plaintiff as consid-

eration for entering into the contract, and there was incorporated therein an express stipulation that its title to this stock should not be affected by any forfeiture of the contract occasioned by default of the plaintiff. Certainly the Continental Company was under an equally binding obligation to carry out the contract, or pay the plaintiff the damages sustained by it for failure so to do. Moreover, neither the Continental Company, nor its successors, ever questioned the binding effect of the obligation assumed by the Continental, and when the plaintiff, on March 19, 1909, in writing notified the successor of the Continental Company that it desired to exercise its option to continue the contract in force for another ten years, the American Tobacco Company, the successor of the Continental, in writing, acknowledged receipt of the notice of such election, and neither by word nor act questioned the right of the plaintiff to make such election. The conduct of the Continental Company and its successors had been such that on March 1, 1913, it was estopped to assert the invalidity of the contract upon any of the grounds urged by the government in this case.

[5] We are thus brought to the first contention of the plaintiff, that to compute the income and profit taxes for the years 1917, 1918, and 1919 without allowing it any deduction from gross income so as to amortize the March 1, 1913, value of such contract over the 76 months that contract had to run after the 1st day of March, 1913, would result in taxation of its capital, and to that extent would be a direct tax without apportionment, in violation of the federal Constitution. If any part of the income of the plaintiff taxed by the government for the years 1917, 1918, and 1919 had been derived from a sale of capital assets, there would be merit in this contention of the plaintiff; but the income taxed for those years was not either in whole or in part derived from any such sale of capital assets. This income was solely and alone the result of the earnings of capital invested, combined with the use of labor, and under the Sixteenth Amendment the Congress had the power to require the payment of the tax without allowing any deduction for the purpose of returning to the taxpayer his entire invested capital at the expiration of the life of the property from which the income was derived. If any part of the income for either of these years had been the result of a sale by plaintiff to another of an interest in the contract itself, a different question would be presented. Therefore the principle laid down in

the case of Doyle v. Mitchell Bros. Co., 247 U. S. 179, 38 S. Ct. 467, 62 L. Ed. 1054, has no application to the facts of this case. It follows that if plaintiff has any right to any such deduction from the gross income for the years in question as is claimed by it, that right must be found in the acts of 1916 and 1918, under which the income and profit taxes for the plaintiff must be computed.

Section 12 of the Revenue Act of 1916 (Comp. St. § 6336*l*) in part provides as follows:

"(a) In the case of a corporation, joint-stock company or association, or insurance company, organized in the United States, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources. * * *

"Second. All losses actually sustained and charged off within the year and not compensated by insurance or otherwise, *including a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in the business or trade.*"

Section 234 of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 6336⅛pp) provides, in part, as follows:

"(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

(7) *A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.*"

(The italics in both quotations are ours.)

If the italicized words contained in the foregoing quotations from the two acts in question do not authorize the deductions claimed by plaintiff, then plaintiff is not entitled to same.

[6] The Revenue Act of 1916 determined the deductions to which plaintiff was entitled for the year 1917, and, after a careful consideration of subdivision 2, paragraph (a), of section 12 of that act, quoted above, the court is forced to the conclusion that no authority can be found in the act for allowing the deduction claimed by the plaintiff for that year. It will be observed that this act authorized a reasonable allowance for exhaustion, wear and tear of the property, arising out of its use or employment in the business or trade. As the court views it, this language can have but one meaning, and that is that if the exhaustion or the wear or the tear of the property was caused

by its use in the business and in the accumulation of the income sought to be taxed, then the deduction should be allowed; otherwise, it should not be. How can it be said that the diminished value of the contract on the last day of 1917, as compared to the first day of 1917, was caused by the use of this contract in the business? This loss of value in the contract would have been sustained, even if the plaintiff had conducted no business in 1917 and had not received a single dollar of income. The shrinkage in value of the contract arose solely out of the fact that on the last day of 1917 that contract had one year less to run than it did at the beginning of 1917.

The contract was undoubtedly "property" used in the business of the plaintiff, but the court cannot accede to the contention that the exhaustion of this property, by virtue of its constantly diminishing life, was exhaustion "arising out of its use or employment in the business or trade" of the plaintiff, as provided by the act of 1916. Nor is this conclusion at variance with the decision of the Supreme Court in the recent case of Lynch v. Alworth-Stephens Co., 45 S. Ct. 274, 69 L. Ed. ——, decided on March 2, 1925. In that case the Supreme Court held that the word "exhaustion," as used in the act of 1916, had a very different meaning from the word "depreciation," used in the Corporation Excise Tax Law of 1909 (chapter 6, 36 Stat. 112), which had been construed by the Supreme Court in the cases of Von Baumbach v. Sargent Land Co., 242 U. S. 509, 37 S. Ct. 201, 61 L. Ed. 460, and United States v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017, not to authorize a deduction on account of exhaustion of ore in mines, resulting from mining operations. The court pointed out that a mining lease is property, and, conferring as it does upon the lessee "the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest" in the ore itself. The court further pointed out that as the ore was mined out, it exhausted this property interest of the lessee, and that there was a corresponding exhaustion of the property interest of the land owner in the same ore. The court nowhere intimates that the depreciation in the value of a lease, occasioned solely because of the shortening of its life as fixed by its terms, would be exhaustion within the meaning of the act of 1916. The exhaustion of the property in the Lynch v. Alworth-Stephens Co. Case, supra, was exhaustion arising out of the use of the property interest involved in the business, and not merely exhaustion arising from the running of time. In this, it would seem, lies the real distinction between that case and the case at bar.

For the reasons indicated, the court holds that the plaintiff is entitled to no deduction from its gross income for the year 1917, on account of the diminished value of the contract at the end of that year.

[7] The income and profit taxes of the plaintiff for the years 1918 and 1919 were imposed under the provisions of the act of 1918, and an examination of the language of subdivision 7, paragraph (a), of section 234 of that act, discloses a very substantial difference between it and the corresponding section of the act of 1916, already referred to. It will be noted that the 1918 act authorizes to be deducted "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." It is significant that this later act of Congress, passed after Congress had had an opportunity to observe the workings of the previous income and profit tax laws and the administration of these laws by the Treasury Department, and probably its construction by some of the District Courts omitted the words, "arising out of its use or employment in the business or trade," found in the corresponding section of the act of 1916. It is a matter of common knowledge that the decision of the Supreme Court in the cases of Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460, and United States v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017, construing the word "depreciation," as used in the Corporation Excise Tax Law of 1909, and the rulings of the Treasury Department, in construing the rights of taxpayers to deductions under the Revenue Acts of Oct. 3, 1913, c. 16 (38 Stat. 114), and 1916, impressed many thoughtful people with the necessity of a more liberal attitude toward the taxpayer in future legislation, and it is fair to assume that when Congress passed the act of 1918, it held the same viewpoint and purposely omitted from the act of 1918 the words, "arising out of its use or employment in the business or trade," found in the act of 1916. Congress certainly knew that there are many species of property, such as the contract in this case, copyrights, and patents, which are used in connection with the business which produces the income taxed, and which depreciate in value as the end of their life approaches, and yet which

lose none of their value as the result of their use or employment in the business. It is a fair deduction to conclude that the difference in the corresponding sections of the acts of 1916 and 1918, heretofore referred to, arose out of the desire of Congress to put such contracts and property rights upon the same footing as is given by the act of 1916 to property which is exhausted by reason of its use in the business. Whatever may have been the purpose of Congress, however, it remains that there is a very substantial difference between the corresponding provisions of the two acts, and the court is convinced that the act of 1918 authorizes a reasonable deduction from gross income to cover exhaustion of property used in the business, whether that exhaustion is caused by the use itself or from other causes, and that, so construed, the plaintiff in this case was entitled to have deducted, from the gross income for each of the years 1918 and 1919, $^{12}/_{76}$ of the March 1, 1913, value of the contract in question. Having reached this conclusion, there yet remains the question of fact as to what was the value of that contract on March 1, 1913.

[8] The contract was undoubtedly of great value on March 1, 1913. The proof is not very satisfactory, as to what its exact value was, but it is so evident that it did have a large value as of that date that the plaintiff should not be deprived of its right to deduct the proper proportion of that value from its gross income for the years 1918 and 1919 because of its inability to establish to a mathematical certainty that value. The plaintiff has attempted to establish its value by two methods: One, by using the profits of the previous 6-year period as a basis for fixing its value for the remaining 6⅓ years it had to run; the other, by proving the difference between the contract price and the fair market value as of March 1, 1913, of the stems covered by said contract, and multiplying this result by the number of tons of stems it was reasonably apparent would be received under the contract during the remainder of its life. Due to the fact that the profits of the company did not come entirely from the handling of the stems covered by the contract, and to the further fact that the proof does not show just what was the profit realized on the stems covered by the contract, the first method must be rejected. Nor is the second method entirely satisfactory, but is one which the court under all the circumstances feels justified in adopting. The proof shows that about March 1, 1913, the plaintiff was offered as high as $35 per ton for a limited quantity of the stems it was receiving under the contract, but this price cannot be accepted as the market value of the entire volume of Burley stems covered by the contract. The fair inference, from the testimony of the witnesses Clinton W. Toms, Charles F. Neiley, and Thomas J. Malone, who had exceptional opportunities to know the value of Burley stems on March 1, 1913, is that a fair value for the stems covered by the contract over the period running from March 1, 1913, to the date of its expiration, would have been $26 per ton. However, in view of the fact that the proof shows that about 1913, and prior thereto, the prevailing price of the 15 per cent. of available Burley stems not covered by the contract was about $8.50 per ton, the court thinks that an average of these two prices, figuring 85 per cent. at $26 per ton and 15 per cent. at $8.50 per ton, would represent a fair price for the stems to be delivered under the contract from March 1, 1913, to the date of its expiration. On this basis the average would be $23.38 per ton. At this figure, the net profit on the stems would be $14.87 per ton. The proof shows that on March 1, 1913, it was reasonably certain that during the remaining 6⅓ years the contract had to run, there would be furnished under it 70,000 tons of stems, which at a profit of $14.87 per ton would have yielded during that period a total profit of $1,040,900. The present value of this sum on March 1, 1913, on a 5 per cent. interest basis, compounded monthly, which the court deems fair, would have been $890,620.58, and this sum is fixed by the court as the value of the contract on March 1, 1913.

It follows, therefore, that in determining the taxable net income of the plaintiff for each of the years 1918 and 1919, in addition to the other deductions made from the gross income for each of said years, there should have been deducted $^{12}/_{76}$ of the March 1, 1913, value as herein fixed, amounting to the sum of $140,624.31 for each of said years.

Counsel will prepare a judgment with a separate finding of facts and conclusions of law, as herein indicated, and submit same for entry.