169 N.J. Super. 511 (1979)
405 A.2d 411
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
ROBERT RANSOM, WILLIAM STILL AND LAWSON WORTHY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1979.
Decided July 13, 1979.
*512 Before Judges FRITZ, BISCHOFF and MORGAN.
Mr. Anthony J. DeSalvo, Assistant Prosecutor, argued the cause for appellant (Mr. James T. O'Halloran, Prosecutor of Hudson County, attorney).
Mr. Jon P. Campbell argued the cause for respondent Robert Ransom (Mr. Eric A. Summerville, Director, Patrick House Legal Clinic, attorney).
The opinion of the court was delivered by FRITZ, P.J.A.D.
This is an appeal by the State, by leave, from an order suppressing evidence discovered by municipal policemen during a warrantless search of a Jersey City tavern. Involved are defendants Worthy, proprietor of the tavern, Still, the bartender, and Ransom, a patron reputed to have been dealing drugs therein. The order being appealed denied suppression with respect to Worthy, but granted suppression of the evidence found on the premises "as it pertains" to Still and Ransom, and wholly suppressed evidence found on the person of Ransom. There is no appeal from *513 the refusal to suppress with regard to Worthy. We reverse the suppression orders.[1]
The police activity was initiated by information from a police informant that Still and Ransom were "dealing" cocaine for Worthy from his tavern. Police officers went to the premises. Pursuant to the agreed plan, two of them went immediately toward the men's room which is where they were advised the narcotics were stored and the area of the premises in which the cocaine was ultimately found. The third immediately "apprehended" Ransom. Having also been advised that Ransom might be armed, the officer patted him down. Concerned by "a bulge in his right pants pocket," the officer asked Ransom "to remove it." Ransom disgorged "five $20 pieces of cocaine."
Ransom and Still were arrested and transported to police headquarters. It appears that shortly thereafter one of the officers was discussing the matter with the informant,[2] who inquired as to whether they seized "the guns" and suggested there might be more narcotics in the safe. The police returned to the tavern with Still. There is evidence that Still volunteered to open the safe for the officers. Two revolvers were taken from the safe.
*514 The judge below doubted that there was justification for the warrantless search of the premises based on the information obtained from the informant. He was of this opinion, first, because he found no "independent * * * verification of the informant's information." Beyond that, he opined that since "the informer first gave his information a week before the raid * * * there was a lack of exigent circumstances justifying the warrantless search." However, he believed that N.J.S.A. 33:1-35 authorized the search of the premises and of the safe located therein.
In this latter regard the trial judge had this to say in his written opinion:
Nevertheless, in spite of the fact that there were no exigent circumstances justfying the warrantless search, the nature of the search in question, or more particularly, where the search took place, distinguishes this case from one involving a typical warrantless search, and thus requires careful consideration. The uniqueness of this case stems from the fact that the search was of a licensed tavern. The State argues that because the subject of the search was a tavern, the police did not require probable cause or exigent circumstances to conduct their search. The authority to conduct the search did not arise from typical constitutional consideration, but, according to the State, from N.J.S.A. 33:1-35. The statute in relevant part states:
The commissioner and each other issuing authority may make, or cause to be made, such investigations as he or it shall deem proper in the administration of this chapter and of any and all other laws now or which may hereafter be in force and effect concerning alcoholic beverages, or the manufacture, distribution or sale thereof or the collection of taxes thereon, including the inspection and search of premises for which the license is sought or has been issued, of any building containing the same, of licensed buildings, examination of the books, records, accounts, documents and papers of the licensee or on the licensed premises.[3]
The leading case interpreting the statute is State v. Zurawski, 89 N.J. Super. 488 (App. Div. 1965) [aff'd o.b. 47 N.J. 160 (1966)]. The defendant was charged with bookmaking. The charge *515 came about because of a warrantless search of a licensed premises, a tavern, in which an illegal lottery slip was discovered. The question presented was whether the result of the search could be used against the tavern owner in a criminal prosecution.
The defendant argued that the statute "was intended to facilitate investigations and searches for the sole purpose of ferreting out violations of the Commissioner's rules with the end of suspension or revocation of the privileges of liquor licenses." State v. Zurawski, supra, at 490. The court responded by stating that the "language granting the search power should be `liberally construed' in accordance with the mandate of N.J.S.A. 33:1-73." Id. at 492. The court also said that the position of a liquor licensee was unique.
* * * from the earliest history of our State, the sale of intoxicating liquor has been dealt with by the Legislature in an exceptional way. Because of its "sui generis" nature and significance, it is a subject by itself, to the treatment of which all the analogies of the law, appropriate to other administrative agencies, cannot be indiscriminately applied. State v. Zurawski, supra, at 491.
Moreover, the court stated that the "sale of intoxicating liquor * * * is not one of the privileges or immunities of citizenship protected by the * * * Constitution * * *, but is rather a business subject to prohibition or regulation." Id. Also, see Blanck v. Mayor, etc., of Magnolia, 38 N.J. 484 (1962).
Other jurisdictions have held similarly. In Hurless v. Department of Liquor Control, 136 N.E.2d 736 (1955), the Ohio supreme court [sic: Court of Appeals] stated that:
By securing his permit and electing to operate under the Liquor Control Act, he has waived the Constitutional protection, if any, of the Ohio Constitution as to the right to search his premises and seize property if found to be in violation of the law. at [sic] 737.
More recently, the United States Supreme Court in dictum also addressed itself to the pervasive government regulation to which a liquor licensee normally must submit. The Court said that "* * * Certain industries have such a history of government oversight that no reasonable expectation of privacy * * * could exist for a proprietor over the stock of such an enterprise. Liquor * * * and firearms * * * are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." Ray Marshall, Secretary of Labor v. Barlow's Inc., supra [, 429 U.S. 1347, 97 S.Ct. 776, 50 L.Ed.2d 739]
In Marshall v. Barlow's Inc., the court held that warrantless inspections to enforce the Occupational Safety and Health Act (OSHA) were unreasonable under the Fourth Amendment. It *516 distinguished its holding from previous decisions having to do with warrantless searches of liquor establishments (Colonnade Catering Corp. v. United States, 397 U.S. 72, 74, 77, 90 S.Ct. 774 [, 25 L.Ed.2d 60] (1970) by stating that "businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." Id. Also see Almeida-Sanches [sic: Sanchez] v. United States, 413 U.S. 266, 271; 92 S.Ct. 2050 [sic: 93 S.Ct. 2535] [, 37 L.Ed.2d 596] (1973).
This is the position of the State  that defendant Lawson Worthy, the licensed owner of the 418 Club, by the very nature of his license, consented to the mandate of N.J.S.A. 33:1-35. State v. Zurawski, supra, states that where N.J.S.A. 33:1-35 is employed it is to be "loosely construed" in accordance with N.J.S.A. 33:1-73. In fact, not only does N.J.S.A. 33:1-73 demand loose construction, but the statute in question, N.J.S.A. 33:1-35, makes a similar requirement. It states that the "above enumeration of purposes and powers shall not be construed as exclusive and shall not limit such power to investigate, examine and subpoena for any purpose consonant with the administration and enforcement of this chapter."
To lend additional support to the contention that the search power of N.J.S.A. 33:1-35 is to be loosely construed one need to only look at the decision in Colonnade Corp. v. United States, supra. While the Supreme Court stated that the federal regulatory scheme governing the sale of liquor precluded forcible entries, it did so because the federal statute provided an exclusive sanction against those licensees who denied entry to the authorities. 26 U.S.C.A. § 7342 calls for the imposition of a $500 fine for every time a liquor licensee refuses the authorities entry to inspect. This, according to the court, is an exclusive sanction formulated by Congress.
The statute now in question on the other hand, N.J.S.A. 33:1-35, is not to be construed as providing an exclusive sanction against its violators. On the contrary, the statute states that "the enumeration of purposes and powers shall not be construed as exclusive." Therefore, based on State v. Zurawski, supra, and N.J.S.A. 33:1-35 and 33:1-73, as well as the history behind the regulation of liquor establishments, this court finds that the contraband found on the shelf at the 418 Club is admissible evidence against defendant Lawson Worthy.
The subsequent search of the safe in which the police confiscated firearms falls into the same category as the search leading to the discovery of the cocaine. Both searches apparently were made under the authority of N.J.S.A. 33:1-35. Therefore, as with the *517 cocaine found on the shelf, the evidence seized from the safe may also be introduced at trial and is admissible evidence against defendant Lawson Worthy.
We incline to agreement with the foregoing, substantially for the reasons expressed in the quoted portion of the trial judge's opinion.
However, without regard for statutory authority, we also believe the search of the premises was neither unreasonable nor constitutionally prohibited.
Correctly aware of and concerned with the catechism of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the trial judge had no problem with the proven reliability of the informer. We are of the opinion that reliability of the confidant is amply demonstrated on the record by unchallenged evidence which is wholly credible.
But the trial judge found the absence of "independent police verification of the informant's information" to be a fatal defect in the procedure. We think that this conclusion, as well as that underlying the absence of exigent circumstances because the "first" information preceded the raid by a week, demonstrates the failure of the trial judge to understand the testimony of the police regarding the nature of the informer's activity and the basis for police reliance. This was not at all the usual case of a one-time report to the authorities by an informer. The ultimate advice, on the day of the raid, represented, rather, the fruition of an information gathering tour by one who had theretofore assisted the police in such an effort and who kept them advised of his activity. An understanding of this methodology  quite apparent from the record and, perhaps predictably, uncontradicted  serves to assure not only that the informant's information was on skillfully gleaned personal knowledge, but also that the raid could not have transpired (or been justified) on the "first" information.
*518 Engagingly credible testimony demonstrates beyond cavil (a) the personal nature of the knowledge which the informer had and (b) why an earlier warrant could not have been obtained. The following is abstracted from cross-examination of one of the raiding police officers by the attorney for Still:
Q Detective Winterhalter, just very briefly, do I understand that you went to these premises because of information received from an informer?
A Yes, sir.
Q Was that information received by you from this informer the day of the arrest?
A Yes, sir.
Q Did you receive any information prior to the day of the arrest with respect to these premises?
A I believe that most of the conversation with the informant is the people he was setting up for us and locating where the contraband was being stored. He had nothing definite prior to the day of the arrest.
Q No. I'm saying did the information received, which was the basis, I am assuming, for your entry into the premises 
A On that afternoon, sir, yes.
Q Prior to that, did you receive any information that you utilized in your effort to enter the premises and conduct your search, or was it just the information you received that particular day?
A Just that particular day.
Q So, we can assume then that any information received from the informer prior to the day of the entry into the bar had nothing to do with this bar.
A No, sir. He hadn't mentioned the bar. He said he was working on these people, and he is going to locate where they were storing the cocaine.
Q So, in other words, he had indicated to you that he was trying to get some information which he can bring back to you, which you can then utilize for your basis of an entry into the bar.
A Or an entry into a home or whatever. Yes, sir.
Prior to that testimony Officer Winterhalter had been asked on cross-examination by Ransom's attorney whether he encouraged his informant to go inside the tavern in order to get more information. After his reply assuring his interrogator *519 that he "[n]ever had to encourage the informant," the following question and answer occurred:
Q I take it that your answer is there was no such discussion.
A The discussion I had with the informant on all occasions, when the informant brought me the facts that he had gathered.
Irrespective of whether the police had corroboration or verification of the information provided by the informant, it is abundantly clear to us that there is readily demonstrated here "the underlying circumstances from which the informer" arrived at the conclusions he imparted to the police. Spinelli, supra, 393 U.S. at 416, 89 S.Ct. at 589. His earlier refusal prematurely to point the finger, and the nature of his participation in the procedure, both serve to reassure that the informer was "relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Id. We believe that probable cause was apparent, the search of the premises was reasonable in the circumstances and that our conclusion in this regard offends neither Aguilar nor Spinelli. The fact that the hearsay of an informer's statement is uncorroborated is not enough to defeat probable cause. Other sufficient reasons for crediting the out-of-court statement, as here, will do. United States v. Harris, 403 U.S. 573, 584, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).
Further, since it seems obvious as well that it was not until the day of the raid that the informer supplied the final piece to make the puzzle picture of probable cause complete and apparent, the exigent circumstances which eluded the trial judge do appear even though the first pieces had been earlier furnished. Irrespective of that which had occurred before during a time when knowledge of it was not sufficiently complete, and with due regard for its incipiency being discerned with increasing probability in the preceding week, the fact of the matter is the total event was, in street parlance, going down now. Simply put, theretofore there had been no sufficient *520 grounds for a warrant; now there was no time. State v. Smith, 129 N.J. Super. 430 (App. Div. 1974), certif. den. 66 N.J. 327 (1974).
Accordingly, we affirm the conclusion of the trial judge respecting the validity of the search of the premises, both for the reasons he gave and on the basis of the reasonable persuasion of probable cause combined with exigent circumstances.
Toward the end of total disposition regarding the search of the premises, we observe that although the trial judge found "no need, in this case, to rule on the issue of consent" by Still to search the safe, we are satisfied that even under State v. Johnson, 68 N.J. 349, 353 (1975), standards, referred to by the trial judge, Still, an employee and agent of the owner, not only consented to the search of the safe, but voluntarily agreed to open it for the authorities.
The question of standing to impeach the search has bobbed to the surface throughout this case. In view of our determination of the propriety of this search of the premises, we need not address the standing issue. But it would appear that those who assert "neither a property nor a possessory interest in the [premises searched], nor an interest in the property seized" may well lack the necessary standing. Rakas v. Illinois, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978).
Thus we decide that the evidence discovered on the shelf and in the safe shall not be suppressed but shall be available to the State and evidential as proof of the charges. Nobody doubts nor challenges its relevance with respect to Worthy, who owned and operated the tavern and whose control over the premises may be conclusively presumed. Different questions are presented with respect to Still and Ransom. Whether the evidence has sufficient relevance, i.e., any tendency in reason to prove any material fact, Evid. R. 1(2), with respect to them seems to constitute a question to be decided by the trial judge at the trial on the evidence adduced. Still's position as a bartender, employee and agent of the *521 owner might well permit reasonable persons to conclude he had sufficient control of the premises to charge him with responsibility for what was found therein. On the other hand, on the abbreviated record before us it would appear that as far as the contraband found other than on his person, Ransom was only a patron in the bar. For now it is sufficient for us to say that the evidence is not suppressed as to anyone. Its availability to the jury as against any of the individual defendants is a matter to be decided on the evidence at trial.
We turn to the issue of the search of Ransom's person. At the outset we note that the error into which the trial judge fell in this regard might well have been predicated on two misstatements which appear in his written opinion; one of law, the other of fact.
First, with reference to a Terry (Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) search, the judge stated, "Once it is determined that a defendant does not have a gun on his person or within his reach, the purpose of the pat-down or stop and frisk is satisfied." (Emphasis supplied.) While Terry was concerned with the seizure of revolvers, it is quite clear that the pat-down search there approved met the constitutional muster of reasonableness by virtue of a policy designed to protect police officers not only from the danger of hidden guns but from the threat to their safety implicit in hidden weapons of any kind. The intrusion there thought to be justified involved one "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. at 1884. The opinion in Terry observes:
* * * American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives. [At 23-24, 88 S.Ct. at 1881, footnote omitted]
Clearly, a police officer does not need to perceive tactile recognition of a firearm before he may protect himself further by *522 insisting on deliverance of the suspected weapon. It is not even necessary for him to identify by species the object of his concern, so long as the fear for his safety resulting from the pat-down is reasonable. A police officer is not required by his occupation or the Constitution of the United States to take unnecessary risks in the performance of his duties or to refrain from the taking of "necessary measures to determine whether the person is in fact carrying a weapon [or the neutralizing of a] threat of physical harm." Terry, supra at 24, 88 S.Ct. at 1881.
Second, the judge said, "The State's witnesses testified that they did not receive any information indicating that defendant Ransom would be armed." That statement is simply not correct. Very early in his direct testimony Officer Winterhalter testified that "the informant had stated that Mr. Ransom might be armed." As a matter of fact, he also testified that this is why his particular assignment in the allocation of duties on the raid was to apprehend Ransom whom he knew "from the street," an undertaking he performed immediately upon the raiding party's entry. He repeated in response to the cross-examination of attorneys for Ransom and for Worthy the fact that the informant had cautioned him that "Deek [Ransom] might be armed."
The trial judge based his suppression of the Ransom search of his finding "it incredible that five tinfoil packets could be mistaken for a gun." He had posited his judicial inquiry in terms of whether the bulge produced by the packets "could lead the officer to believe that it was a gun."
The difficulty here is produced not only by the judge's misconception of the law to the effect that the threatening bulge had to produce the effect of being in fact a gun, but by the proposition that neither Officer Winterhalter nor the State forwarded the theory that the officer feared a gun. The testimony clearly demonstrates that Winterhalter did not know exactly what it was: he resisted all sorts of cross-examination coaxing designed to have him state it was or was not thought *523 to be a gun. At one point he even testified, "It could have been a knife. I don't know."
Whatever it was or was not when it existed as a bulge in the pocket of the recently apprehended drug dealer there in the ambience of an ongoing tavern raid, it is perfectly obvious from Winterhalter's testimony and perfectly credible that to him it represented the source of the caution from the informant that "Deek might be armed," and as such it caused him concern for his safety. We do not think that such a concern, in all the circumstances then and there existing, was at all unreasonable. It was no more than an assertion of the entitlement guaranteed by Terry: "for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing * * * in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30-31, 88 S.Ct. at 1884-1885.
In re State in Interest of D.S., 125 N.J. Super. 278, dissent at 283 (App. Div. 1973), rev'd on the dissent, 63 N.J. 541 (1973), in which police officers were merely "checking out" three juveniles who were talking on the street "to see if anything had happened or if anything was being transacted" (at 283), is clearly distinguishable from the instant case where defendant was presently involved in a reported criminal happening and was reputed to be armed. Terry instructs us that the careful balancing of interests in the pat-down problem must be decided on the circumstances of the individual case. 392 U.S. at 30, 88 S.Ct. 1868.
The suppression order is reversed. The case is remanded for trial. We do not retain jurisdiction.
NOTES
[1] Only Worthy and Ransom moved below to suppress. However, counsel for Still appeared on the hearing of the motion. The assistant prosecutor volunteered that the motion was being brought by "[a]ll three defendants," and the judge acceded to Still's "just joining in." Still did not appear on this appeal. Of course, his interests are before us nevertheless. Gnapinsky v. Goldyn, 23 N.J. 243, 250 (1957).
[2] The factual finding by the trial judge in this regard arrived in terms of "another informant then informed the police that there were guns and possibly more narcotics contained in a safe located at the tavern." Each of two police officers testified to receiving this information. The question as to whether it was the same or another informant presents neither a contradiction nor any significant problem.
[3] The opinion of the trial judge does not accurately quote the statute as amended subsequent to the amendment by L. 1935, c. 257, p. 808. The differences are not significant.