796 A.2d 214

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
DEREK ROACH, A/K/A DALE ROACH AND ZEEK
ROACH, DEFENDANT–RESPONDENT.

Argued January 29, 2002—Decided April 24, 2002.

*James L. McConnell,* Assistant Prosecutor, argued the cause for appellant (*Wayne J. Forrest,* Somerset County Prosecutor, attorney, *Joanne R. Gavan,* Assistant Prosecutor, on the brief).

*Ruth Bove Carlucci,* Assistant Deputy Public Defender, argued the cause for respondent (*Peter A. Garcia,* Acting Public Defender, attorney).

*Christine A. Hoffman,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter C. Harvey,* Acting Attorney General, attorney).

The opinion of the court was delivered by

LONG, J.

Defendant, Derek Roach, entered a plea of guilty to the third-degree offenses of possession of cocaine (*N.J.S.A.* 2C:35-5) and possession of cocaine and heroin within a school zone (*N.J.S.A.* 2C:35-7; *N.J.S.A.* 2C:35-10(a)(1)). He was sentenced as a repeat offender to concurrent seven-year terms, each with a three-year period of parole ineligibility. He appealed, challenging the denial of his motion to suppress and the denial of his motion for admittance to a drug rehabilitation program. The Appellate Division reversed the denial of Roach's motion to suppress, thus rendering the drug rehabilitation program issue moot. We granted certification, *State v. Roach,* 169 *N.J.* 609, 782 *A.*2d 427 (2001), and allowed the Attorney General to appear as *amicus curiae.*

I

The facts established on the motion to suppress are as follows: On May 24, 1998, at 12:26 a.m., Officer David Fisher of the Hillsborough Police, traveling in a marked unit, spotted a silver-colored Volkswagen on Route 206 in Hillsborough. Officer Fisher noticed that the right headlight of the vehicle was extremely dim and not properly directed. After observing the car pull into a gas station, Officer Fisher also recognized that the vehicle had a rejected inspection sticker for the month of April, but he could not

tell if that sticker was overdue. Officer Fisher followed the car when it left the gas station and then attempted to stop it by activating his lights. In spite of his signals to stop, the car traveled approximately one-quarter of a mile before coming to rest in the parking lot of a residential apartment complex. Officer Fisher pulled up behind the car and recounted what occurred next: "As soon as the vehicle came to a stop, the driver immediately exited the vehicle and began to walk away. At that time I had to exit my vehicle quickly and order the driver back into the car." The driver complied and returned to the vehicle.

Once the driver was back in the car, Officer Fisher approached him and requested his driver's license, vehicle registration, and proof of insurance. The driver produced a vehicle registration and proof of insurance but said that he did not have his license with him and that it was at home. The officer, however, noticed something in the driver's wallet that looked like a license and asked him to remove it, which he did. That document was a boat operator's license identifying the driver as defendant Derek Roach. The registration, however, indicated that the car belonged to a woman with another last name, who defendant claimed was his mother. Officer Fisher never confirmed the woman's identity nor her relationship to defendant.

While the officer was examining those credentials, defendant was "extremely nervous, fidgety, and obviously seemed like he was in a hurry." The officer also detected "a strong odor of an alcoholic beverage emanating from his breath." Officer Fisher then asked defendant to recite the alphabet, which he failed to do correctly on three separate occasions. Additionally, the officer testified that, while he was speaking to defendant, "on two separate occasions defendant, I guess, failed to put the emergency brake on the vehicle and the vehicle rolled backwards, almost striking my patrol car." After that, Officer Fisher returned to his patrol car to check the driver's license and vehicle registration number and to radio Officer Stephen Gonzalez, the DWI enforcement officer on duty that evening. While Officer Fisher was in

the patrol car, defendant "attempted a second time to get out of the vehicle, and again had to be ordered back inside the car." Defendant again complied and remained seated in the car until Officer Gonzalez arrived.

Upon Officer Gonzalez's arrival, Officer Fisher learned from the mobile data computer in the patrol car that defendant's driver's license was suspended. After Officer Fisher communicated everything he knew to Officer Gonzalez, Officer Gonzalez approached the driver's side of defendant's car and began to speak to him. Officer Gonzalez also smelled alcohol and asked defendant if he had been drinking. Defendant replied that he had consumed a couple of beers. Officer Gonzalez then noticed what appeared to be a fresh bloodstain on defendant's shirt, in the middle of the chest area, that was apparently the result of a nosebleed. Officer Gonzalez asked defendant if he needed medical assistance, which defendant declined. When defendant lifted his right arm to look at the bloodstain, Officer Gonzalez "noticed that there was a bulge in his groin area of his pants." Officer Gonzalez described the bulge as being about the size of a baseball and stated that all he could see was part of a plastic bag protruding from defendant's pants. The visible part was the top corner of that bag, which was approximately one inch long and "smushed up."

When Officer Gonzalez asked defendant what the bulge was, defendant immediately reached for it with his right arm. Officer Gonzalez grabbed defendant's hand and repeatedly yelled at defendant to lift his hands into the air. Defendant instead reached for the bulge with his other hand. Officer Gonzalez grabbed defendant's other hand and, while holding both of defendant's hands with both of his own hands, called for Officer Fisher.

Officer Gonzalez testified that he "was concerned that [the bulge] was a gun, because [defendant] was adamant about reaching for it, and that's why I reached inside the car. It's not something I would normally do in order to grab somebody." On cross-examination, Officer Gonzalez acknowledged that in his five years on the police force he had never found somebody to be

carrying a gun in a plastic bag. He also acknowledged that he made no mention of the fact that he might have been concerned that defendant was carrying a gun or other weapon in his report.

Officer Fisher, who had been standing on the passenger side of the car, looked over when he heard Officer Gonzalez yelling and "observed the defendant attempting to reach down towards his groin area." Officer Fisher saw Officer Gonzalez "grab [defendant's] hands to prevent him from reaching down towards his waist." Officer Fisher ran to the driver's side to assist Officer Gonzalez.

Officer Fisher reached into the car and saw both the bulge and the piece of plastic sticking out of defendant's waist area. Officer Fisher testified that he patted defendant's waistband with his palm, and "felt [a] bulge." He then "[p]roceeded to pull [the] piece of plastic out." The plastic turned out to be a clear plastic bag containing glassine vials of what later proved to be cocaine. That plastic bag also contained folds of heroin and a bag of cocaine. The bag was sandwich-sized and completely stuffed.

After pulling out the plastic bag, the officers opened the car door, ordered defendant out of the car, "handcuffed, searched him and placed him in the rear of [the] patrol car." The officers searched the car and found a brown paper bag under the front seat containing approximately 150 empty glassine vials and a bag of multi-colored rubber bands. Defendant was taken to the Somerset County Jail where a corrections officer searched him and found a glassine vial in his shirt pocket containing what was later revealed to be cocaine.

On those facts, the trial court denied defendant's motion to suppress. Citing *Terry v. Ohio,* 392 *U.S.* 1, 26–27, 88 *S.Ct.* 1868, 1882–83, 20 *L.Ed.*2d 889, 909 (1968), the court held that the stop was legitimate because of the malfunctioning headlight and the rejection sticker. In addition, the court held that the frisk was lawful because an objective belief existed that defendant could be armed and dangerous based on his conduct: "Police are not required to stand there at the side of the car like a couple of

mannequins waiting for this guy to pull out whatever it is that is in his pants. . . . That would be dangerous. Here the officer acted in a reasonable manner, under the circumstances, reacting to the sudden actions and movement by the defendant."

The Appellate Division, denominating the case as an "extremely close call," reversed on the ground that the state failed to sustain its burden of showing that the warrantless search fit within an exception to the warrant requirement. Although agreeing that the stop and pat-down were legitimate, the court went on to hold that Officer Fisher exceeded the permissible bounds of a *Terry* stop when he pulled out the plastic bag because the pat-down did not indicate the presence of a weapon.

II

On appeal, the state argues that the stop of defendant was proper under *Terry,* that defendant's erratic conduct warranted a pat-down of the bulge, and that defendant's refusal to allow the pat-down to be completed, under the totality of the circumstances, required retrieval of the unidentified item.

Defendant counters that the motion to suppress should have been granted because the officers had no reason to believe defendant was armed and dangerous, and that once the officer's palm pat-down did not reveal a weapon no further intrusion was justified.

The Attorney General argues that where the circumstances create an objectively reasonable concern for the officer's safety and the officer is unable to determine from an initial pat-down of a suspect's clothing whether a bulging object is indeed a weapon, the officer must be permitted to remove that object immediately for safety reasons.

III

The issue in this case is whether the warrantless seizure by law enforcement officers of the contents of the bulge in defendant's

pants during an investigatory stop exceeded the scope of a valid protective search under *Terry v. Ohio, supra,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889. All parties agree that the initial stop was proper.

The protective search exception to the warrant requirement was created to protect an officer's safety where there is reason to believe that a suspect is armed and dangerous. *Id.* at 26–27, 88 *S.Ct.* 1868, 1882–83, 20 *L.Ed.*2d 889, 909. The exception allows a law enforcement officer "to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 23, 88 *S.Ct.* at 1881. Specifically, the officer may conduct "a carefully limited search of the outer clothing ... in an attempt to discover weapons which might be used to assault him." *Id.* at 30, 88 *S.Ct.* at 1885. The search must, however, be "confined in scope to an intrusion reasonably designed to discover" weapons that might be used to assault the police officer. *Id.* at 29, 88 *S.Ct.* at 1884. Therefore, in order to conduct a protective search, an officer must have a "specific and particularized basis for an *objectively* reasonable suspicion that defendant was armed and dangerous." *State v. Thomas,* 110 *N.J.* 673, 683, 542 *A.*2d 912 (1988). The existence of an objectively reasonable suspicion is based on the totality of the circumstances. *State v. Valentine,* 134 *N.J.* 536, 546, 636 *A.*2d 505 (1994). The totality of the circumstances test " 'balanc[es] the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.' " *Ibid.* (quoting *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859 (1986)). Because the intrusion is designed to protect the officer's safety, the standard governing protective searches is " 'whether a reasonably prudent man in the circumstances would be warranted in his belief that his safety or that of others was in danger.' " *Id.* at 543, 636 *A.*2d 505 (quoting *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909).

The standard " 'does not deal with hard certainties, but with probabilities ... [and] common-sense conclusions about hu-

man behavior.' " *Valentine, supra,* 134 *N.J.* at 543, 636 *A.*2d 505 (quoting *United States v. Cortez,* 449 *U.S.* 411, 418, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 629 (1981)).

> Oftentimes ... law-enforcement officers must make instantaneous decisions about whether a frisk for weapons is justifiable. The task is an unenviable one often fraught with life-and-death consequences.... "[C]ourts should not set the test of sufficient suspicion ... too high when the protection of the investigating officer is at stake."
>
> [*Id.* at 545, 636 *A.*2d 505 (quoting *United States v. Riggs,* 474 *F.*2d 699, 705 (2d Cir.), *cert. denied,* 414 *U.S.* 820, 94 *S.Ct.* 115, 38 *L.Ed.*2d 53 (1973)).]

 Accordingly, courts have upheld seizures of unidentifiable objects on a suspect's person where a lawful pat-down is either inconclusive or impossible. The reasoning in such cases is that the officer's safety is paramount and that the officer is justified in taking further steps if necessary to protect his safety:

> Clearly, a police officer does not need to perceive tactile recognition of a firearm before he may protect himself further by insisting on deliverance of the suspected weapon. It is not even necessary for him to identify by species the object of his concern, so long as the fear for his safety resulting from the pat-down is reasonable. A police officer is not required by his occupation or the Constitution of the United States to take unnecessary risks in the performance of his duties or to refrain from the taking of "necessary measures to determine whether the person is in fact carrying a weapon (or the neutralizing of a) threat of physical harm."
>
> [*State v. Ransom,* 169 *N.J.Super.* 511, 521–22, 405 *A.*2d 411 (App.Div.1979)(quoting *Terry, supra,* 392 *U.S.* at 24, 88 *S.Ct.* at 1881)(alteration in original).]

██ Here, the relevant circumstances include the late hour, the bloodstain on defendant's shirt, his nervousness, his failure to pull over immediately, his impairment by alcohol, his failure to produce a valid driver's license or evidence of his ownership of the car, his attempts to leave the scene, his sudden and repeated attempts to reach for a bulge in his pants, his refusal to obey the officer's directive to lift his hands in the air, and the fact that he had to be physically restrained. Like the trial court, we are satisfied that those frenetic circumstances together rendered reasonable the officers' belief that further action was required to ensure their safety. That belief is underscored by Officer Gonzalez's testimony that he was concerned about a gun and Officer Fisher's action of "running" to assist Gonzalez.

To be sure, Officer Fisher did not identify the bulge as a weapon when he fleetingly palmed it during the moments surrounding the seizure. That is what distinguishes this case from cases like *U.S. v. Hassan El*, 5 *F.3d* 726, 731 (1993), *cert. denied*, 511 *U.S.* 1006, 114 *S.Ct.* 1374, 128 *L.Ed.*2d 50 (1994), where the officer felt a handgun during a protective pat-down. In such circumstances, what is felt justifies the seizure. Here, the officer's feel of the bulge did not reveal what it was. But that was not the end of the inquiry. The officers were faced with a nervous and intoxicated defendant who refused to obey their lawful orders and continued to move his hands toward the unidentified bulge. That erratic behavior justified the officers' further action to neutralize any potential threat.

Defendant's contrary arguments have resonance only when the facts and circumstances surrounding the seizure are picked apart and replayed in slow motion. Such an analysis simply does not correlate to the reality of the facts in this record.

That is not to suggest that every time an officer pats down a defendant and cannot ascertain what he is feeling, he is free to seize the item. As all parties acknowledge, the officer must have a reasonable suspicion that defendant is armed and dangerous. *Ibid.* (*citing Terry v. Ohio, supra*, 392 *U.S.* at 27, 88 *S.Ct.* at 1883). Simply stated, the facts surrounding the event are pivotal. Where, as here, the totality of the circumstances creates an objectively reasonable concern for the officers' safety, retrieving the contents of the bulge from defendant's person is allowable. As we said in *State v. DeLuca*, 168 *N.J.* 626, 634, 775 *A.*2d 1284 (2001):

> When the police act reasonably in the face of genuine exigency, their warrantless conduct is sustainable as part of the balancing of interests that constitutes the bulk of our search-and-seizure jurisprudence. Stated differently, the core inquiry in this setting is whether the police conduct was objectively reasonable under the totality of the circumstances. *Ohio v. Robinette*, 519 *U.S.* 33, 39, 117 *S.Ct.* 417, 421, 136 *L.Ed.*2d 347, 354 (1996); *State v. Stelzner*, 257 *N.J.Super.* 219, 229, 608 *A.*2d 386 (App.Div.), *certif. denied*, 130 *N.J.* 396, 614 *A.*2d 619 (1992).

The judgment of the Appellate Division is reversed. The matter is remanded for trial.

*For reversing and remanding*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.