NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2466-13T3
 A-4115-13T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

HOPETON B. BROWN, JR. and
LAMAR A. JONES,

 Defendants-Appellants.
___________________________________

 Submitted October 11, 2016 – Decided August 1, 2017

 Before Judges Ostrer, Leone and Vernoia.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment No. 10-11-1702.

 Joseph E. Krakora, Public Defender, attorney
 for appellant Hopeton B. Brown, Jr. (Stephen
 P. Hunter, Assistant Deputy Public Defender,
 of counsel and on the brief).

 Joseph E. Krakora, Public Defender, attorney
 for appellant Lamar Jones (Frank J. Pugliese,
 Assistant Deputy Public Defender, of counsel
 and on the brief).

 Andrew C. Carey, Middlesex County Prosecutor,
 attorney for respondent (Susan L. Berkow,
 Special Assistant Prosecutor, of counsel and
 on the briefs).
 Appellant Hopeton B. Brown, Jr. filed a pro
 se supplemental brief.

PER CURIAM

 Defendants Hopeton B. Brown, Jr., and Lamar A. Jones were

convicted of second-degree conspiracy to commit robbery, N.J.S.A.

2C:5-2, N.J.S.A. 2C:15-1(a), and fourth-degree criminal trespass,

N.J.S.A. 2C:18-3, as a lesser-included offense of first-degree

attempted armed robbery, N.J.S.A. 2C:5-1, N.J.S.A. 2C:15-1(a).

Jones was also convicted of two firearms-related offenses: he

unlawfully possessed a handgun, N.J.S.A. 2C:39-5(b), and he did

so for an unlawful purpose, N.J.S.A. 2C:39-4(a), both second-

degree offenses. Jones was acquitted of fourth-degree unlawful

possession of hollow nose bullets. N.J.S.A. 2C:39-3(f). Brown

was acquitted of all three firearms-related offenses. Both

defendants were acquitted of criminal trespass by peering, another

lesser-included offense of attempted armed robbery. The court

sentenced Brown to an aggregate seven-year sentence, and Jones to

an aggregate eight-year sentence, both subject to the No Early

Release Act, N.J.S.A. 2C:43-7.2.

 In brief, the prosecution arose out of an incident shortly

before midnight on an August evening in North Brunswick. A

concerned citizen reported to police that three men were acting

suspiciously in front of a house on the block where he lived.

 2 A-2466-13T3
Police officers responded and stopped Jones, Brown and Keree Wade,

who later testified against the other two. Upon investigation,

police discovered that Jones and Wade possessed identical ski

masks. The police found a third ski mask and a pistol discarded

near the scene. DNA collected from the pistol's magazine matched

a sample from Jones.

 Wade's testimony at trial detailed the three men's intentions

that night. He stated that they had planned to rob the home of a

drug-dealer. After they arrived and Jones observed children in

the proposed victim's home, they began to get cold feet. The

three were in the midst of reconsidering their plan when police

arrived. After being discovered, they fled the scene. Wade

testified that he and Brown temporarily hid in the doorway of the

residential building. The two were immediately separated from

Jones.

 Defendants challenge the court's denial of a suppression

motion, evidentiary rulings, the sufficiency of the evidence, and

the jury instructions.

 I.

 We first consider defendants' challenge to the court's denial

of the motion to suppress Jones's ski mask. Jones argues:

 3 A-2466-13T3
 POINT I

 THE SKI MASK TAKEN FROM DEFENDANT SHOULD HAVE
 BEEN SUPPRESSED BECAUSE THERE WAS NO
 REASONABLE SUSPICION OF CRIMINAL ACTIVITY TO
 JUSTIFY THE INVESTIGATORY STOP OR, IN THE
 ALTERNATIVE, TO SEIZE THE SKI MASK. U.S.
 Const. Amends IV, XIV; N.J. Const. Art. I, ¶¶
 1, 7.

Brown contends:

 POINT I

 THE SKI MASK TAKEN FROM CO-DEFENDANT JONES
 SHOULD HAVE BEEN SUPPRESSED BECAUSE THERE WAS
 NO REASONABLE SUSPICION OF CRIMINAL ACTIVITY
 TO JUSTIFY THE INVESTIGATORY STOP OF JONES.
 ALTERNATIVELY, THE SEARCH AND SEIZURE OF THE
 SKI MASK EXCEEDED THE SCOPE OF AN
 INVESTIGATORY STOP. U.S. Const. Amends IV,
 XIV; N.J. Const. Art. I, ¶¶ 1, 7.

 In sustaining the stop, and the search and seizure of the ski

mask, the trial judge credited the sole witness at the suppression

hearing, North Brunswick police officer Michael Sauvigne. He and

other officers were dispatched to the scene based on the citizen's

report of the three men acting suspiciously. When he arrived, he

saw Jones sprinting down a sidewalk a couple blocks from where the

citizen and two officers first saw the three men. Jones's two

cohorts were being followed by two other officers on the opposite

side of the street.

 Jones then stopped and attempted to enter a parked car from

the passenger-side door. Since there had been a rash of car

 4 A-2466-13T3
burglaries that summer, Sauvigne initially suspected that Jones

might be breaking into the car. Sauvigne stopped his marked police

vehicle in the middle of the street behind the car. Sauvigne got

out and asked Jones, who was wearing a heavy hooded sweatshirt,

to approach him. As Jones did, he had both hands in the hoodie's

front pocket. After he removed his hands upon Sauvigne's command,

a bulge remained.

 Sauvigne then investigated the contents of Jones's front

pocket, though the precise manner in which he did so is unclear.

Sauvigne initially testified, "I ask him what the bulge is, and

when I ask him about the bulge, he reaches in and says it's a hat,

and pulls out a — a hat." Sauvigne said it was a ski hat with

"eye holes cut out, and I believe either a mouth or a nose hole."

Asked on cross-examination, "And you asked him to remove it?"

Sauvigne responded, "I'm not sure if I asked him to remove it or

if he said it's my hat and reached in. I believe he said it's my

hat and he reached in and grabbed it out."

 In his oral decision, the court presumed the officer asked

Jones to remove the hat. After reviewing the events leading to

the stop, the judge stated:

 The [c]ourt finds that the request of the
 officer[] to take out . . . whatever was in
 the gentleman's pocket is perfectly
 appropriate given the time of night, the --
 the tenor of what's going around and the

 5 A-2466-13T3
 totality of circumstances, and the taking of
 that hat is perfectly appropriate given all
 of the information that was had by the officer
 at that time.[1]

However, in his written order filed the same day, the judge omitted

the finding that Sauvigne asked Jones to remove the hat, stating:

"Officer Sauvigne's inquiry as to what was in defendant Jones'

pocket, after which defendant Jones pulled out a black ski mask,

was lawful given all the information Officer Sauvigne had at that

time . . . ."

 Jones and Brown contend Sauvigne engaged in an investigatory

stop without an articulable and reasonable suspicion of criminal

activity. They further argue that even if he had grounds to stop

Jones, the seizure of the hat exceeded the stop's legitimate scope.

We disagree.

 As our Supreme Court has recently emphasized, we apply a

deferential standard of review to trial court fact findings on a

motion to suppress evidence based on live testimony. State v.

S.S., ___ N.J. ___ (2017) (slip op. at 16). We respect the trial

court's opportunity to assess witnesses and have a "feel" of the

1
 In the course of oral argument, the judge suggested it did not
matter whether the officer had asked Jones to remove the hat or
he did so on his own. After reviewing the circumstances, the
judge stated, "I would find and do find that even as an order, it
was perfectly reasonable self protection where there's a bulge in
somebody's pocket to make inquiry as to what it is and ask that
it be seen."

 6 A-2466-13T3
case (indeed, we must defer even where the trial court evaluates

video recorded evidence without live witnesses). Id. at 16, 25.

We shall uphold findings "supported by sufficient credible

evidence in the record," and shall not overturn a decision merely

because we "would have reached a different conclusion." Id. at

16 (internal quotation marks and citation omitted). However, we

owe no deference to trial courts' legal conclusions, "unless

persuaded by their reasoning." Id. at 25 (internal quotation

marks and citation omitted).

 Applying this standard of review, we discern adequate support

in the record for the conclusion that the officer, under the

"totality of the circumstances," had not just a hunch, but a

reasonable and articulable suspicion of criminal activity, to

justify his investigatory stop of Jones. See, e.g., State v.

Privott, 203 N.J. 16, 29-30 (2010); State v. Basil, 202 N.J. 570,

588-89 (2010); State v. Davis, 104 N.J. 490, 504-05 (1986).

 Sauvigne responded to the report of suspicious activity from

a concerned and identified neighbor, not an anonymous tipster.

See State v. Stovall, 170 N.J. 346, 362 (2002) (stating that an

ordinary citizen is assumed to have sufficient veracity and

requiring no further showing of reliability). The observed men

were reported lingering near a house around midnight. See State

v. Gamble, 218 N.J. 412, 433 (2014) (location and hour of day

 7 A-2466-13T3
contribute to a reasonable and articulable suspicion). Sauvigne

spotted Jones, who was wearing a heavy hoodie in August. See

United States v. Maguire, 359 F.3d 71, 77 (1st Cir. 2004) (suspects

wearing clothing "inappropriate for the weather" contributed to a

reasonable and articulable suspicion). Sauvigne reasonably

believed Jones was one of the three men reported by the neighbor,

and he was sprinting down the street to avoid being caught. See

State v. Piniero, 181 N.J. 13, 26 (2004) (stating that flight, "in

combination with other circumstances . . . may support reasonable

and articulable suspicion"). Mindful of a recent spate of car

burglaries, he saw Jones attempt to enter a parked car from the

passenger side. See State v. Citarella, 154 N.J. 272, 280 (1998)

(considering "rash of burglaries in the area" as a factor in

reasonably suspecting defendant of criminal activity); State v.

Contreras, 326 N.J. Super. 528, 541 (App. Div. 1999) (stating that

"recent nearby crimes" can be a factor in finding reasonable

suspicion). Furthermore, Jones was far away from where he was

originally spotted, providing additional cause to suspect he was

attempting to enter a car not his own.

 Sauvigne also had a reasonable articulable suspicion that

Jones possessed a weapon, justifying his subsequent protective

search. Added to the circumstances that justified the stop,

Sauvigne observed a bulge in Jones's front pocket after he removed

 8 A-2466-13T3
his hands. The totality of those circumstances created an

objectively reasonable fear that a weapon caused the bulge, posing

a threat to Sauvigne's safety. "Indeed, a bulge alone has been

held sufficient to validate a protective pat-down." State v.

Smith, 134 N.J. 599, 621 (1994) (citing Pennsylvania v. Mimms, 434

U.S. 106, 111-12, 98 S. Ct. 330, 334, 54 L. Ed. 2d 331, 338

(1977)). Accordingly, the officer was "entitled for the protection

of himself and others in the area to conduct a carefully limited

search of the outer clothing . . . in an attempt to discover

weapons which might be used to assault him." Terry v. Ohio, 392

U.S. 1, 30, 88 S. Ct. 1868, 1884-85, 20 L. Ed. 2d 889, 911 (1968).

 Sauvigne's search was appropriately "confined in scope to an

intrusion reasonably designed to discover weapons that might be

used to assault the police officer." State v. Roach, 172 N.J. 19,

27 (2002) (quoting Terry, supra, 392 U.S. at 29, 88 S. Ct. at

1884, 20 L. Ed. 2d at 910) (internal quotation marks omitted).

Not every Terry search is limited to a pat and frisk. "[C]ourts

have upheld seizures of unidentifiable objects on a suspect's

person where a lawful pat-down is either inconclusive or

impossible." Id. at 28-29 (upholding search and seizure where

officer reached into suspect's bulging pocket after inconclusive

pat down). Nevertheless, the officer must resort to the "least

intrusive maneuver to protect" his safety. Privott, supra, 203

 9 A-2466-13T3
N.J. at 31. In reviewing whether an officer has done so, "the

facts surrounding the event are pivotal." Roach, supra, 172 N.J.

at 29.

 Officer Sauvigne asked Jones what was in his pocket. Jones

answered it was a hat. Even assuming he did not remove it until

Sauvigne's request, the officer's conduct met the fundamental

test: it was "objectively reasonable under the totality of the

circumstances." Ibid. (internal quotation marks and citation

omitted).

 Sauvigne's conduct would have been more intrusive had he not

asked Jones what caused the bulge, but immediately commanded him

to empty his pocket. Such an order would have invaded Jones's

privacy interests over all its then-undisclosed contents. And

once Sauvigne asked the question and received the answer that it

was a harmless hat, it was reasonable for Sauvigne to confirm that

fact. He could do so one of three ways: by patting and frisking

Jones, which would have invaded Jones's bodily integrity; reaching

into his pocket, which would have invaded his privacy interests

over any other contents; or asked Jones to show him the hat. The

course taken by Sauvigne was the least intrusive one.

 Finally, Sauvigne had probable cause to retain the hat as

evidence of suspected criminal activity. See Minnesota v.

Dickerson, 508 U.S. 366, 379, 113 S. Ct. 2130, 2139, 124 L. Ed.

 10 A-2466-13T3
2d 334, 348 (1993) (holding that officer must have probable cause

to believe object was related to crime in order to seize it

permanently from the suspect); see also State v. Bruzzese, 94 N.J.

210, 236-38 (1983) (stating that, in order to seize property in

plain view, there must be "probable cause to associate the property

with criminal activity" (quoting Texas v. Brown, 460 U.S. 730,

741-42, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502, 513 (1983))).

Here, the "incriminating character of the object[,]" Dickerson,

supra, 508 U.S. at 379, 113 S. Ct. at 2139, 124 L. Ed. 2d at 348,

was obvious. Possession of a ski mask may well appear innocuous

in January, but in August it was akin to possession of burglary

tools or another instrument of criminal activity, particularly in

light of the attendant circumstances. Cf. State v. Matthews, 799

N.W.2d 911 (Wisc. Ct. App.) (noting that even in cold weather,

when defendant "may have worn the ski mask and hoodie to stay warm

so that his choice of clothing was innocent," the police had a

reasonable suspicion of criminal activity to further investigate),

review denied, 806 N.W.2d 640 (2011).

 Lastly, the fact that Sauvigne did not also arrest Jones is

of no moment. "[P]robable cause to arrest and probable cause to

search involve distinct and not necessarily identical inquiries."

State v. Chippero, 201 N.J. 14, 31 (2009). The same distinction

holds true for probable cause to seize.

 11 A-2466-13T3
 In sum, we discern no error in the court's denial of the

motion to suppress the ski mask.

 II.

 We turn next to claimed evidentiary errors at trial. Jones

contends, as his Point II:

 THE COURT VIOLATED DEFENDANT'S RIGHTS TO
 CONFRONTATION, TO DUE PROCESS AND TO PRESENT
 A DEFENSE BY PRECLUDING HIM FROM PRESENTING
 EVIDENCE UNDERMINING THE CREDIBILITY OF CO-
 DEFENDANT WADE. U.S. CONST. AMENDS VI, XIV;
 N.J. CONST., ART. I, ¶¶ 1, 10.

Brown contends, as his Point III:

 THE PROSECUTOR'S QUESTIONING CONCERNING
 DEFENDANT'S SILENCE VIOLATED HIS RIGHT AGAINST
 SELF-INCRIMINATION AND THEREFORE AMOUNTED TO
 PROSECUTORIAL MISCONDUCT. U.S. Const. Amend.
 XIV, N.J. Const. Art. I, ¶ 1.

 We consider these points in turn.

 A.

 The court denied the effort of Jones's counsel during Wade's

cross-examination to elicit evidence that he was a member of a

gang. Citing N.J.R.E. 608, the judge found that evidence of gang

membership was not admissible to attack Wade's credibility. The

judge also considered gang membership as evidence of a crime or

other wrongful act under N.J.R.E. 404(b) as applied in State v.

Cofield, 127 N.J. 328, 338 (1992). The judge noted that the

evidence was not relevant to a material issue because the State

 12 A-2466-13T3
had not alleged, nor was there evidence that, "the alleged crime

was instigated or part of any kind of gang activity . . . ." The

court also concluded that evidence of gang activity was more

prejudicial than probative under N.J.R.E. 403.

 Jones argues that he was entitled "to impeach the credibility

of the State's witness via his prior bad acts, i.e., his gang

affiliation, and establish that through his gang activity he had

ready access to firearms, including the one he attributed to

defendant in this case." He argues the court's evidentiary ruling

was erroneous and deprived him of his constitutional rights.

 "A trial court's evidentiary rulings are entitled to

deference absent a showing of an abuse of discretion, i.e., there

has been a clear error of judgment." State v. Nantambu, 221 N.J.

389, 402 (2015) (internal quotation marks and citation omitted).

We apply de novo review on issues of law, ibid., or if the trial

court applies the wrong legal standard, State v. Darby, 174 N.J.

509, 518 (2002).

 Defendant proffered two purposes for eliciting Wade's gang

affiliation: to undermine his credibility and to establish his

ready access to firearms, including the one attributed to Jones.

As to the first purpose, the court correctly barred testimony of

Wade's gang affiliation because N.J.R.E. 405 and N.J.R.E. 608

preclude evidence of specific instances of conduct to challenge a

 13 A-2466-13T3
witness's credibility. State v. Scott, ___ N.J. ___, ___ (2017)

(slip op. at 13). As the Court has recently described:

 N.J.R.E. 405 provides that "[s]pecific
 instances of conduct not the subject of a
 conviction of a crime shall be inadmissible,"
 and N.J.R.E. 608 indicates that "a trait of
 character cannot be proved by specific
 instances of conduct" unless the prior act was
 a "false accusation against any person of a
 crime similar to the crime with which
 defendant is charged."

 [Ibid.]

 Jones's second purpose in introducing evidence of gang

affiliation implicates both N.J.R.E. 404(b) and N.J.R.E. 403. As

to the former rule, we recognize that when a defendant seeks to

use evidence of another's crime or wrong defensively, the more

stringent test in Cofield does not apply because "an accused is

entitled to advance in his defense any evidence which may

rationally tend to refute his guilt or buttress his innocence of

the charge made." State v. Weaver, 219 N.J. 131, 150 (2014)

(internal quotation marks and citation omitted). When a defendant

offers N.J.R.E. 404(b) evidence "exculpatorily, prejudice to the

defendant is no longer a factor, and simple relevance to guilt or

innocence should suffice as the admissibility standard." Ibid.

(internal quotation marks and citation omitted). It is thus

unclear whether N.J.R.E. 404(b) should preclude the admission of

Wade's gang membership.

 14 A-2466-13T3
 Regardless, "trial courts must still determine that the

probative value of [other wrongs] evidence is not substantially

outweighed by any of the [N.J.R.E.] 403 factors . . . ." Id. at

151. Application of those factors justified exclusion of evidence

of Wade's gang membership as it would have resulted in undue

prejudice, confused the issues and misled the jury. In particular,

had evidence been elicited that Wade was a gang member, it would

have opened the door to evidence that Brown and Jones were members

as well. Wade so alleged in his statement to police.

 Even assuming gang membership may serve as circumstantial

evidence of exposure to guns generally, it is less probative of

possession of a gun on a particular occasion. Moreover, a jury

could misuse evidence of gang membership to conclude Wade was

unworthy of belief, or "a bad person in general," Cofield, supra,

127 N.J. at 336 (internal quotation marks and citation omitted),

uses barred by N.J.R.E. 608 and 404(b). In any event, counsel

elicited on cross-examination that Wade had seen guns regularly

on the streets.

 Finally, we discern no merit to defendant's argument that the

court's evidentiary ruling denied him his constitutional rights

of confrontation and due process. The right to cross-examine

witnesses is "among the minimum essentials of a fair trial . . . ."

Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045,

 15 A-2466-13T3
35 L. Ed. 2d 297, 308 (1973). Yet, "the right to confront and to

cross-examine is not absolute and may, in appropriate cases, bow

to accommodate other legitimate interests in the criminal trial

process." Id. at 295, 93 S. Ct. at 1046, 35 L. Ed. 2d at 309.

While "denial or significant diminution" of a defendant's rights

requires close scrutiny of those competing interests, ibid., a

court may place "reasonable limits on . . . cross-examination" to

guard against "prejudice, confusion of the issues . . . or

interrogation that is . . . only marginally relevant." State v.

Budis, 125 N.J. 519, 532 (1991) (internal quotation marks and

citation omitted). As there was no "denial or significant

diminution" of defendant's rights, we discern no constitutional

violation.

 B.

 Brown contends he was denied a fair trial because the

prosecutor improperly elicited Brown's silence in response to

police questioning. Brown points to a question to a different

witness, Wade. Wade testified that when the officers first stopped

him and Brown, they asked Wade about Jones. Wade testified that

he denied knowing Jones. The prosecutor then asked, "And did

Hopeton [Brown] answer that question as well?" Over an objection

of Brown's counsel, Wade confirmed that the question was also

asked of Brown and that he did not respond.

 16 A-2466-13T3
 The State may use a defendant's silence to impeach

credibility, when the silence does not occur "at or near" the time

of arrest, and "there is no government compulsion and the objective

circumstances demonstrate that a reasonable person in defendant's

position would have acted differently . . . ." State v. Stas, 212

N.J. 37, 58 (2012) (citation omitted). Yet, the silence "cannot

. . . be used as substantive evidence of a defendant's guilt."

Ibid. Here, although Brown's alleged silence did not occur at or

near the time of arrest, it apparently served as substantive

evidence. Although Brown did not deny knowing Jones, according

to Wade, he also declined to admit knowing him — perhaps

demonstrating a consciousness of guilt.

 However, we view the admission of evidence of Brown's silence

to be harmless. First, Sauvigne contradicted Wade's account of

Brown's silence, and testified that he believed both men "said the

same thing" in denying they knew or were with Jones that evening.

Second, the substantive weight of Brown's silence, even if the

jury credited Wade over Sauvigne, was negligible. Brown was among

the three men spotted by the neighbor. He was in the company of

Wade, who admitted his involvement in the scheme, and attributed

the initial idea to Brown. Sauvigne testified he saw all three

men leave the scene together, and they later arrived together at

the police station to retrieve certain items that had been seized.

 17 A-2466-13T3
Thus, Brown's silence added little to the evidence of Brown's

involvement and his guilt. Its admission did not deny defendant

a fair trial.

 III.

 Both defendants contend the court erred in its jury

instruction. Jones also raises points regarding the State's

summation, and the sufficiency of the evidence as to the trespass

and weapons offenses. Jones contends:

 POINT III

 FOURTH-DEGREE CRIMINAL TRESPASS SHOULD NOT
 HAVE BEEN SUBMITTED FOR THE JURY'S
 CONSIDERATION BECAUSE THE STATE'S EVIDENCE
 FAILED TO ESTABLISH A PRIMA FACIE CASE OF
 CRIMINAL TRESPASS BY UNLAWFUL ENTRY OF A
 DWELLING. THEREFORE, THE TRESPASS CONVICTION
 MUST BE VACATED AND THE CHARGE DISMISSED.
 ALTERNATIVELY, THE COURT SHOULD FIND THE
 INSTRUCTION ON THE CHARGE OF CRIMINAL TRESPASS
 ERRONEOUS, AS IT CONFLATED THE FOURTH-DEGREE
 OFFENSE WITH THE PETTY DISORDERLY PERSONS
 OFFENSE. CONSEQUENTLY, THE TRESPASS
 CONVICTION MUST BE VACATED AND A NEW TRIAL ON
 THAT OFFENSE ORDERED.

 POINT IV

 DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
 ON THE WEAPONS OFFENSES SHOULD HAVE BEEN
 GRANTED.

 POINT V

 IN THREE SHORT INFLAMMATORY SENTENCES
 DELIVERED IN SUMMATION THE PROSECUTOR ALSO
 BOLSTERED ITS OWN WITNESS AND DENIGRATED THE
 DEFENDANTS. THIS INSTANCE OF MISCONDCUT

 18 A-2466-13T3
 NECESSITATES REVERSAL OF DEFENDANT'S
 CONVICTIONS AND A NEW TRIAL (Not Raised
 Below).

 Brown contends, in his Point II:

 THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY
 FAILING TO CHARGE LESSER-INCLUDED OFFENSES TO
 CONSPIRACY. U.S. Const. Amend. XIV; N.J.
 Const. Art. I, ¶ 1.

He also contends in a pro se supplemental brief:

 POINT 1

 THE COURT ERRED IN CHARGING THE JURY WITH
 ARMED ROBBERY; [THE] ERRONEOUS JURY CHARGE
 DEPRIVED DEFENDANT OF A FAIR TRIAL.

 POINT 2

 CONVICTION FOR 2ND DEGREE CONSPIRACY TO COMMIT
 ROBBERY LACKED LEGAL MERIT, AND THE COURT
 ERRED IN NOT GRANTING A POST-VERDICT MOTION
 FOR A NEW TRIAL.

 A.

 We find merit only in Jones's contention that the evidence

did not support his conviction of criminal trespass of a dwelling.2

We begin with the elements of the offense. A person commits a

fourth-degree offense if, "knowing that he is not licensed or

2
 Jones filed a post-trial motion for a judgment of acquittal or,
alternatively, a new trial, which the court denied. He did not
specifically raise, and consequently the court did not
specifically address, the adequacy of the evidence in support of
the fourth-degree trespass conviction. Nonetheless, we conclude
Jones preserved his ability to raise the issue whether the jury
verdict was against the weight of the evidence. See R. 2:10-1.
The State does not disagree.

 19 A-2466-13T3
privileged to do so, he enters or surreptitiously remains in any

. . . structure" and the "offense . . . is committed in a dwelling."

N.J.S.A. 2C:18-3(a). If the offense is not committed in a dwelling

(or other structures or facilities specifically identified), then

the offense is a disorderly persons offense. Alternatively, a

person commits the petty disorderly persons offense of defiant

trespass if:

 knowing that he is not licensed or privileged
 to do so, he enters or remains in any place
 as to which notice against trespass is given
 by:

 (1) Actual communication to the actor;
 or

 (2) Posting in a manner prescribed by law
 or reasonably likely to come to the attention
 of intruders; or

 (3) Fencing or other enclosure manifestly
 designed to exclude intruders.

 [N.J.S.A. 2C:18-3(b).]

Thus, subsection (a) covers entry into a house — a "structure" and

a "dwelling"; and subsection (b) covers entry into a house's

backyard — "any place." See State v. Braxton, 330 N.J. Super.

561, 566-67 (App. Div. 2000) (noting that the latter is not a

lesser-included offense of the former).

 There was no evidence that Jones entered the dwelling of the

proposed robbery victim or any other dwelling or structure. Wade

 20 A-2466-13T3
testified that he, Brown and Jones waited outside the target's

residence. After spotting the target, they eventually left the

vehicle and assembled by the side of the house. Then Jones left

the two and walked to the front of the house to see who was inside.

Jones returned to tell Wade and Brown that he had seen children.

Police then arrived. Wade testified he and Brown "went into the

next house; it was open . . . so we sat in the hallway. Lamar

[Jones], I don't know where he was at; he was on the side of the

house." Two officers followed Wade and Brown. Sauvigne ultimately

caught up with Jones.

 Although we must give the State the benefit of all favorable

testimony and all favorable inferences that one could reasonably

draw, see, e.g., State v. Rodriguez, 141 N.J. Super. 7, 11-12

(App. Div. 1976), it would be pure speculation to conclude that

Jones entered the dwelling or any other structure. Wade did not

see him do so, and it is unreasonable to infer he did based on the

surrounding circumstances. Indeed, the State's theory was that

Jones separated himself from Wade and Brown in order to dispose

of the weapon.

 We note that there was also an insufficient basis to convict

Jones of either disorderly persons or petty disorderly persons

trespass. The lack of proof that Jones entered the dwelling or

any other structure compels an acquittal of disorderly persons

 21 A-2466-13T3
trespass under subsection (a). Furthermore, the jury instructions

were inadequate to convict defendant of petty disorderly persons

trespass. The verdict sheet asked the jury to determine whether

Jones, "knowing that he was not licensed or privileged to do so,"

either (1) "was in any place" or (2) "enter[ed] the premises" at

the specified address.3 Although being "in any place" without

authority is an element of a petty disorderly persons offense

under subsection (b), the jury was never instructed as to the

"notice against trespass" element of the petty disorderly persons

offense.

 Therefore, a judgment of acquittal shall be entered as to

trespass. Any further comment on Jones's contentions regarding

the jury instruction on criminal trespass is unnecessary.

 B.

 Having searched the record, we are unconvinced that Brown

requested an instruction on the lesser-included offense of

conspiracy to commit theft. Thus, we review his argument under a

plain error standard, which requires a showing of error "clearly

capable of producing an unjust result." State v. Funderburg, 225

N.J. 66, 79 (2016) (quoting R. 2:10-2). The court is required to

give an unrequested instruction sua sponte "when there is obvious

3
 Notably, as the question was posed in the disjunctive, it is
unclear whether the jury even found entry at all.

 22 A-2466-13T3
record support for such a charge"; in other words, "[o]nly if the

record clearly indicates a lesser-included charge — that is, if

the evidence is jumping off the page . . . ." Id. at 81 (internal

quotation marks and citations omitted).

 Brown contends that the evidence that he knew Jones possessed

a gun was equivocal. Wade testified that when they arrived at the

target's house, Jones retrieved the gun from the trunk. Wade

further stated that Brown was standing at the side of the car and

could not see precisely what Jones was getting. But, particularly

in light of the other evidence in support of the crime as charged,

uncertainty regarding whether Brown saw the gun falls short of

"obvious record support" for charging the lesser-included offense

that Brown conspired with the others only to commit a theft.

 Wade testified that Brown was the one who proposed to "rob"

the victim, and Brown was the one who disclosed the target

possessed over $100,000. All three conspirators waited for the

target to be in his home, and they all had ski masks — both facts

suggesting they intended to confront their victim. It is also

implausible to believe that their intended target would part with

over $100,000 unless "threaten[ed] . . . or purposely put[] . . .

in fear of immediate bodily injury . . . ." N.J.S.A. 2C:15-1(a).

 Although this review of the record demonstrates that Brown

has failed to meet his burden, there is even less factual basis

 23 A-2466-13T3
for the lesser-included offense when one considers the evidence

surrounding Wade's and Jones's intent. After all, Wade testified

that Jones possessed the gun; Wade saw that he did; Jones's DNA

was on the gun; and the gun was found near the spot where Jones

was arrested. There can be no doubt that Jones and Wade planned

to commit a robbery that night.

 Brown does not consider the latter evidence in his brief

because he contends he could conspire to commit a theft even if

Jones and Wade conspired with him to commit a robbery. His

argument relies on our Court's adoption of the "unilateral"

approach to conspiracy. We are unpersuaded by his application of

this doctrine.

 An essential element of a conspiracy is the agreement with

another to commit a specific crime:

 A person is guilty of conspiracy with another
 person or persons to commit a crime if with
 the purpose of promoting or facilitating its
 commission he:

 (1) Agrees with such other person or
 persons that they or one or more of them will
 engage in conduct which constitutes such crime
 or an attempt or solicitation to commit such
 crime; or

 (2) Agrees to aid such other person or
 persons in the planning or commission of such
 crime or of an attempt or solicitation to
 commit such crime.

 [N.J.S.A. 2C:5-2(a).]

 24 A-2466-13T3
As noted in State v. Del Fino, 100 N.J. 154, 160 (1985), which

Brown cites, this definition focuses a trier of fact on the

individual conspirator's culpability, rather than the culpability

of the conspiracy as a whole.

 But the drafters' "unilateral" approach only meant that there

need not be at least two guilty conspirators in order for a

conspiracy to exist. Ibid. For example, a conspiracy can exist

where the defendant's only co-conspirator faked his agreement.

See State v. Conway, 193 N.J. Super. 133, 159-60 (App. Div.)

("[U]ndercover agents can be conspirators for the purpose of

proving that a conspiracy existed."), certif. denied, 97 N.J. 650

(1984); State v. La Forge, 183 N.J. Super. 118, 119-21 (Law Div.

1981); see also Paul H. Robinson & Jane A. Grall, Element Analysis

in Defining Criminal Liability: The Model Penal Code and Beyond,

35 Stan. L. Rev. 681, 752-53 (1983) (noting that a "unilateral

concept of agreement" only requires "that the defendant believe

that he has entered into an agreement with the co-conspirator" and

that the nonliability of a co-conspirator is not a defense under

this theory).

 Indeed, the drafters of this provision distinguished its

definition from others that required "at least two guilty

conspirators" in order for there to be a conspiracy at all. II

New Jersey Criminal Law Revision Commission: Commentary p. 131

 25 A-2466-13T3
(1971) (internal quotation marks and citation omitted). Quoting

the Tentative Draft of the Model Penal Code, the Criminal Law

Revision Commission noted three contexts in which the unilateral

approach would yield a different result from a bilateral approach:

"[w]here the person with whom the defendant conspired" (1) "is

irresponsible or has immunity"; (2) "secretly intended not to go

through with the plan"; and (3) "has not been apprehended or tried,

or his case has been disposed of in a manner that would raise

questions of consistency about a conviction of the defendant."

Ibid.

 Brown suggests a different understanding of "unilateral"

conspiracy. It does not involve a conspiracy with an irresponsible

actor or an undercover officer who "agrees" to engage in criminal

conduct but does not intend to follow through; nor does it involve

a conspiracy with another person who has been or is later

acquitted. Brown contends a conspiracy could exist without a

meeting of the minds at all: he could think he was agreeing with

his cohorts to commit a theft, while his cohorts believed he was

agreeing to commit a different crime. Brown has provided no

precedent for that precise proposition, nor have we found any. In

any event, the trial court was not required, sua sponte, to fashion

an instruction based on such a novel theory.

 26 A-2466-13T3
 C.

 The remaining issues presented by Jones and by Brown in his

supplemental pro se brief lack sufficient merit to warrant extended

discussion. R. 2:11-3(e)(2). The following brief comments with

respect to Jones's points will suffice.

 The court did not err in denying Jones's motion for a judgment

of acquittal on the weapons offenses as there was ample evidence

from which a jury could reasonably convict. Although Jones raised

questions about the chain of custody of the firearm and other

aspects of the DNA testing, Sauvigne testified that he

appropriately handled the firearm and secured it. An expert

testified that Jones's DNA was found on the magazine. Furthermore,

Wade testified that Jones possessed the firearm; Jones fled

separately from Brown and Wade when police arrived; and the firearm

was found near the spot where Jones was stopped.

 Jones's claim of prosecutorial misconduct pertains to remarks

in the prosecutor's closing statement. To persuade the jury that

the State's agreement with such an unlikable character as Wade was

unavoidable, the prosecutor compared the State's agreement with

one federal prosecutors were famously constrained to make with the

noted organized crime figure, John Gotti. As defense counsel did

not object, we presume the comments were not prejudicial. State

v. Frost, 158 N.J. 76, 83 (1999). We are unconvinced there was

 27 A-2466-13T3
error, let alone plain error, warranting a new trial. The

prosecutor's remarks were neither inflammatory, nor were they

likely to be understood to liken defendants to "mob members." If

anything, they defamed the State's own witness.

 Affirmed as to Brown; affirmed in part and reversed in part

as to Jones.

 28 A-2466-13T3